*Commissioner of Financial Regulation v. Brown, Brown & Brown, P.C., et al.*
No. 102, September Term 2015


**Commercial Law – Maryland Credit Services Business Act – Credit Services Business – Extension of Credit.** The Maryland Credit Services Businesses Act applies to any person who, among other things, offers to obtain an extension of credit for a consumer in return for the payment of money. Because an "extension of credit" encompasses a deferral of debt incurred for household purposes, the statute applies to those who offer, in return for the payment of money, to negotiate a loan modification for a homeowner facing foreclosure – unless one of the exemptions in the statute applies. Maryland Code, Commercial Law Article, §14-1901 *et seq*.

**Commercial Law – Maryland Credit Services Business Act – Attorney Exemption.** An attorney who conducts activities that are otherwise within the definition of a "credit services business" under the Maryland Credit Services Businesses Act is exempt from the provisions of that Act if the attorney (1) is a member of the Maryland Bar; (2) carries out those activities within the scope of the practice of law; and (3) does not engage in a credit services business "on a regular and continuing basis." This exemption did not apply to a Virginia law firm and its managing partner, who was not a licensed Maryland attorney, when they engaged in a credit services business "on a regular and continuing basis" over a nine-month period – in particular, consulting with several hundred Maryland homeowners who faced foreclosure about the possibility of assisting them in renegotiating their mortgage loans and entering into agreements with 57 of those homeowners under which the homeowner paid money to the firm in return for the firm's undertaking to assist in obtaining a modification of the homeowner's loan. Maryland Code, Commercial Law Article, §14-1901(e)(3)(vi).

Circuit Court for Baltimore City
Case No. 24-C-13-002529
Argument: June 2, 2016

IN THE COURT OF APPEALS
OF MARYLAND

Docket No. 102

September Term 2015

_____

COMMISSIONER OF
FINANCIAL REGULATION

V.

BROWN, BROWN, & BROWN, P.C., ET AL.

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Battaglia, Lynne A.
(Retired, Specially
  Assigned),

JJ.

_____

Opinion by McDonald, J.

_____

Filed: August 19, 2016

Maryland law places various restrictions on those who purport to assist consumers in obtaining credit – restrictions that include certain licensing, bonding, and disclosure requirements. These requirements are set forth in the Maryland Credit Services Businesses Act ("MCSBA"), codified at Maryland Code, Commercial Law Article ("CL"), §14-1901 *et seq.* Under the rubric "credit services business," the MCSBA applies to those who offer, in return for the payment of money, to assist a homeowner in default on a mortgage loan to fend off foreclosure by obtaining a modification of that loan from the lender. In an accommodation to other regulatory regimes, the statute exempts from its requirements certain entities and professions that are regulated by other bodies. Among those exemptions is one for Maryland lawyers acting within the scope of their legal practice, so long as they do not engage in activities that constitute a "credit services business" on a "regular and continuing basis."

In this case, Respondent Brown, Brown & Brown, P.C. ("BB&B"), a small Virginia law firm, consulted with hundreds of Maryland homeowners facing foreclosure, and entered into more than 50 agreements with homeowners over a nine-month period in 2008 and 2009. The firm's managing partner, Respondent Christopher E. Brown, oversaw this aspect of the firm's business and signed many of the agreements. Under these agreements, in return for an advance payment of money by the homeowner, BB&B promised to attempt to renegotiate the mortgage loan so that the homeowner could avoid foreclosure. BB&B ultimately did not obtain loan modifications for any of those homeowners.

After receiving a complaint about BB&B from a family that had entered into such an agreement, Petitioner Commissioner of Financial Regulation ("Commissioner"), who has primary responsibility for enforcing the MCSBA, initiated the administrative proceedings that resulted in this case. Following an evidentiary hearing, an administrative law judge ("ALJ") of the Office of Administrative Hearings concluded that Mr. Brown and his firm had violated the MCSBA in several respects and recommended that the Commissioner issue a permanent cease and desist order, impose a substantial civil monetary penalty, and direct BB&B and Mr. Brown to pay treble damages to the Maryland homeowners with whom they had agreements. The Commissioner accepted the ALJ's recommendations and issued an order imposing that relief.

Respondents sought judicial review. The Circuit Court reversed the agency decision on the ground that the agreements with the Maryland homeowners were for legal services rather than credit services and that the MCSBA did not apply to BB&B and Mr. Brown. The Court of Special Appeals affirmed in an unreported opinion. We granted *certiorari*.

We hold that the agency decision accurately construed the MCSBA and was supported by substantial evidence. There is substantial evidence in the administrative record that BB&B and Mr. Brown represented that, in return for the payment of money, they would undertake to obtain a loan modification for the homeowners with whom they had agreements. Those activities fell within the definition of "credit services business" under the statute, unless BB&B and Mr. Brown qualified for an exemption.

There is also substantial evidence in the record to support the conclusion that BB&B and Mr. Brown did not qualify for the attorney exemption in the MCSBA. While BB&B

2

employed at least one Maryland attorney during the relevant period, Mr. Brown and another non-Maryland attorney at the firm executed many of the agreements. More importantly, the evidence revealed that the firm engaged in these activities on a "regular and continuing basis" during the relevant period of time and therefore did not qualify for the exemption.

## I

## Background

### A. *Statutory Framework*

*Credit Services Business*

The MCSBA defines a "credit services business" as "*any person* who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform" any of certain enumerated services "in return for the payment of money or other valuable consideration." CL §14-1901(e)(1) (emphasis added).[1] The term "person" is defined to include not only individuals, but also various types of entities, as well as "any other legal or commercial entity." CL §14-1901(g). The enumerated services that qualify a person as a "credit services business" are: "(i) Improving a consumer's credit record, history, or rating or establishing a new credit file or record; (ii) Obtaining an *extension of credit* for a consumer; or (iii) *Providing advice or*

---

[1] A credit services business also "includes a person who sells or attempts to sell written materials containing information that the person represents will enable a consumer to establish a new credit file or record." CL §14-1901(e)(2).

3

*assistance to a consumer* with regard to either [of the first two services]." CL §14-1901(e)(1) (emphasis added). An "extension of credit" is defined as "the right to defer payment of debt, or to incur debt and defer its payment, offered or granted primarily for personal, family, or household purposes." CL §14-1901(f).

Thus, an individual or entity that, in return for the payment of money, offers to assist a consumer in obtaining an extension of credit – such as the deferral of a debt that was incurred for household purposes – falls within the general definition of "credit services business."

*Attorney Exemption*

Notwithstanding the breadth of the general definition of "credit services business" in the statute, there are 10 categories of individuals and entities excluded from that definition. CL §14-1901(e)(3). Each of those categories relates to individuals or entities whose activities are regulated by other authorities. Pertinent to this case, one such category encompasses "[a]n individual admitted to the Bar of the Court of Appeals of Maryland when the individual renders services within the course and scope of practice by the individual as a lawyer and does not engage in the credit services business on a regular and continuing basis." CL §14-1901(e)(3)(vi). We will refer to this provision as the "attorney exemption."[2] A person who claims the benefit of an exemption, such as the attorney exemption, has the burden of establishing entitlement to the exemption. CL §14-1907(d).

---

[2] Other exemptions relate to banks, other lenders authorized by State or federal law, nonprofit organizations, licensed real estate brokers, licensed mortgage lenders, securities broker-dealers, consumer reporting agencies, and certified public accountants, among

4

*Regulation of Credit Services Businesses*

The MCSBA applies to any contract with a Maryland resident involving credit services. CL §14-1903(a). It regulates the activities of a credit services business in a number of ways. Among other things, a credit services business may not "[c]harge or receive any money or other valuable consideration prior to full and complete performance of the services that [it] has agreed to perform for or on behalf of the consumer," must be licensed by the Commissioner, must provide the consumer with certain specified information before "either the execution of a contract or agreement between a consumer and a credit services business or the receipt by the credit services business of any money or other valuable consideration," must use contracts meeting certain requirements, and must obtain a surety bond. CL §§14-1902(6), 14-1903, 14-1904, 14-1906, and 14-1908. A contract for credit services that fails to comply with the MCSBA is void and unenforceable. CL §14-1907(b).

The provisions of the MCSBA are primarily enforced by the Commissioner of Financial Regulation, who may issue cease and desist orders and initiate administrative enforcement proceedings. CL §§14-1911 through 14-1913.[3] One who negligently fails to

---

others. CL §14-1901(e)(3). As with the attorney exemption, the exemption for CPAs is lost if the individual engages in a credit services business "on a regular and continuing basis."

[3] Violations of the MCSBA also may be enforced by the Consumer Protection Division of the Office of the Attorney General as violations of the Consumer Protection Act. CL §14-1914.

comply with the statute is liable for any actual damages sustained by consumers, as well as attorney's fees and the costs of the proceeding.  CL §14-1912(b).  One who "willfully" violates the MCSBA is liable for any actual damages suffered by the consumer, a monetary award of treble damages of the total amount collected from the consumer, as ordered by the Commissioner, and any punitive damages that a court awards, as well as costs and attorney's fees.  CL §14-1912(a).  The Commissioner also has authority, under the general enforcement authority of that office, to impose a civil monetary penalty of up to $1,000 for a first violation and up to $5,000 for each subsequent violation.  Maryland Code, Financial Institutions Article ("FI"), §2-115(b)(3).

## B.    Facts

### The Firm

The following facts were found by the ALJ who conducted the hearing and were accepted by the Commissioner, or are undisputed.  During the relevant period, BB&B was a law firm located in Alexandria, Virginia, that employed no more than four attorneys at any one time.[4]  Mr. Brown, an attorney licensed to practice law in Virginia and the District of Columbia, served as the managing partner of BB&B and was its sole shareholder.  Mr. Brown was not licensed to practice law in Maryland.

During the time period relevant to this case, BB&B employed a Maryland lawyer to meet with Maryland clients and work on their matters.  Specifically, Bradley Deutchman, a lawyer licensed in Maryland, worked for BB&B during 2008, but left in

---

[4] We are advised, in Respondents' Brief, that BB&B no longer exists.

6

January 2009. After Mr. Deutchman left the firm, it employed Adam Polsky, who was also licensed in Maryland, for three or four months at the beginning of 2009. If a Maryland lawyer was not available to meet with a Maryland client of BB&B, Mr. Brown or Michael Miller, a lawyer licensed in the District of Columbia, would meet with the Maryland client instead.

*Referrals of Homeowners Facing Foreclosure*

During late 2008 and early 2009, Mortgage Analysis & Consulting LLC, a Virginia–based business that advertised in Spanish-language media and that accepted fees from homeowners to analyze their mortgage status, referred hundreds of Maryland homeowners to BB&B.[5] The ALJ found that Mortgage Analysis & Consulting was responsible for 90 per cent of the homeowners who consulted with the firm during that period.[6] Mr. Deutchman estimated that the firm actually entered into agreements with less than a quarter of those homeowners. Mr. Deutchman testified that, by the time he left the firm in early 2009, he spent the majority of his time dealing with the homeowners facing foreclosure. Between June 2008 and March 2009, at least 57 Maryland homeowners, most of whom were referred by Mortgage Analysis & Consulting, paid BB&B to help them with their mortgage debts. Most of the Maryland homeowners who entered into these agreements

---

[5] According to one of its principals, who testified at the administrative hearing, Mortgage Analysis & Consulting went out of business in November 2009.

[6] In their brief, BB&B and Mr. Brown indicate that the firm met with what they term a "low estimate" of at least 400 Maryland homeowners referred by Mortgage Analysis & Consulting.

with BB&B were native Spanish-speakers and spoke little or no English. Most, if not all, of the homeowners were seeking a modification of their mortgage loans.

*Agreements with Homeowners*

The agreements between BB&B and Maryland homeowners were entitled either "Retainer Agreement" or "Fee Agreement." Although the agreements varied in their precise content and some contained parallel provisions in Spanish as well as English, certain provisions were common to the vast majority of the agreements. Under the agreements, homeowners paid BB&B amounts varying from $2,500 to $7,500 up front before receiving any services. The amount paid, according to the agreement, was deemed "earned upon receipt." An introductory paragraph of the agreement, which appears in several different iterations in the agreements, stated that BB&B would represent the homeowners in negotiations with the homeowner's lender, foreclosure defense, and possible litigation concerning the homeowner's property. The nature of the work, in relation to the amount paid, was elaborated in a paragraph entitled "BB&B's Obligations." That paragraph specified that, in consideration for the money paid by the homeowner, the firm would "engage the appropriate party in discussions to renegotiate the terms of your loan." If the renegotiation of the homeowner's mortgage loan proved unsuccessful, BB&B was to "assess the chances of success in state or federal court and the costs involved" to decide whether to do something more. In the event of such further action, the agreements provided that BB&B would receive an additional fee (usually stated as a 40% contingency fee, or any attorney's fee awarded by a court, whichever was greater).

Only four of the agreements with Maryland homeowners were signed by the firm's Maryland lawyer on behalf of BB&B. Thirteen were signed by other BB&B lawyers, including Mr. Brown, on behalf of BB&B, while most of the agreements had no signature of any attorney on behalf of BB&B.

BB&B apparently made little effort to actually renegotiate loans and did not obtain a loan modification for any of the Maryland homeowners with whom it had agreements. There was some evidence that it made other efforts that it referred to as "foreclosure defense." In particular, it would sometimes send what Mr. Deutchman referred to as "form letters" to lenders requesting documentation under certain federal statutes in the hope that the lender would fail to make a timely response and that BB&B might use that failure as leverage in future negotiations.[7]

*The Experience of Mr. and Mrs. Batres*

Testimony at the administrative hearing focused on the example of Miguel and Teresa Batres, who filed the complaint with the Commissioner that initiated this case. Ms. Batres, whose native language is Spanish and who does not read English, responded to a Spanish-language radio advertisement for Mortgage Analysis & Consulting. After paying $150 to that entity, she was referred to BB&B to help her obtain a loan modification. On

---

[7] The letters were known as QWRs ("qualified written request"), which were sent to lenders and loan servicers pursuant to the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §2601 *et seq.,* and Requests for Validation of Debt, which were sent to debt collectors pursuant to the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §1692 *et seq.*

9

July 23, 2008, she and her husband signed an agreement with BB&B and paid $1,500 of the $3,000 specified in the agreement.

Approximately six months later, after receiving a notice initiating a foreclosure action as to their home, and a form notice of the Commissioner advising homeowners in foreclosure of potential remedies, the Batreses contacted the Commissioner's Office to lodge a complaint against BB&B. The Batreses alleged that BB&B had done nothing on their behalf and asked for their money back. The Batreses eventually lost their home to foreclosure.[8]

*Non-Compliance with the MCSBA*

Neither BB&B nor Mr. Brown nor any of the firm's other attorneys has ever been licensed under the MCSBA. Nor did they apparently comply with the other requirements of the Act, such as the bonding and disclosure requirements. None of the agreements contained any advisements relevant to credit services.

## C. Procedural History

*Administrative Investigation and Charges*

As a result of the Batres complaint, the Commissioner investigated BB&B. On the basis of that investigation, the Commissioner issued a Summary Order to Cease and Desist on March 6, 2009 to BB&B, Mr. Brown, Mr. Deutchman, and Mr. Miller that alleged

---

[8] The parties blame one another for this result: the Commissioner asserts that BB&B did nothing to assist the Batreses during the six months between the agreement and the filing of the Batreses' complaint; BB&B asserts that its compliance with the subsequent cease and desist order prevented it from doing anything on the Batreses' behalf.

10

various violations of the MCSBA. In response, BB&B terminated its agreements with Maryland homeowners. In April 2009, Mr. Deutchman settled with the Commissioner, admitting the essentials of the alleged violations. BB&B and Mr. Brown requested a contested case hearing.[9] The Commissioner referred the matter to the Office of Administrative Hearings for a hearing and proposed decision.

*Administrative Hearing and Decision*

On September 28 and November 4, 2010, an ALJ of the Office of Administrative Hearings held an evidentiary hearing. After receiving post-hearing briefs, the ALJ issued a Proposed Decision on March 8, 2011, concluding that BB&B and Mr. Brown had violated the MCSBA. The ALJ recommended that the Commissioner issue a final cease and desist order and assess a civil monetary penalty in the amount of $114,000 under FI §2-115(b)(3). In addition, the ALJ found that the violations were "willful" and, accordingly, recommended that the Commissioner order that BB&B and Mr. Brown pay to the homeowners treble damages pursuant to CL §14-1912(a)(2).

The matter was delegated to the Deputy Commissioner of Financial Regulation as final agency decisionmaker under the State Administrative Procedure Act. *See* FI §2-103; Maryland Code, State Government Article, §§10-216, 10-221. On May 5, 2011, the Deputy Commissioner issued a Proposed Order adopting the ALJ's findings of fact, conclusions of law, and recommended order with minor amendments. Two weeks later,

---

[9] The Commissioner apparently was never able to serve Mr. Miller with the order.

11

BB&B and Mr. Brown advised the Commissioner that they excepted to the proposed disposition of the case and asked for an exceptions hearing.

There followed an interregnum during which the parties entered into a settlement agreement and consent order. BB&B and Mr. Brown were apparently unable or unwilling to carry out some of the monetary requirements of the consent order and the administrative proceeding was revived.[10] The Deputy Commissioner held a hearing on the exceptions of BB&B and Mr. Brown on October 4 and October 23, 2012.

On March 26, 2013, the Deputy Commissioner issued an Opinion and Final Order concluding that BB&B and Mr. Brown had violated the MCSBA. The Opinion and Final Order also declared that the agreements with Maryland homeowners were void and unenforceable, ordered BB&B and Mr. Brown to cease and desist from engaging in any credit services business activities with Maryland residents, held BB&B and Mr. Brown jointly and severally liable for a civil monetary penalty of $114,000,[11] and directed them

---

[10] In its brief in this appeal, BB&B and Mr. Brown ask us to order the Commissioner to refund payments they made under that settlement. That issue was not raised in the petition for *certiorari*, and no cross-petition was filed concerning that issue. Given our disposition of this case, the Circuit Court may consider on remand how any such payments should be credited in the order it ultimately enters.

[11] The ALJ recommended that the Commissioner assess a $1,000 penalty for each of the 57 agreements BB&B entered into with Maryland homeowners without being licensed as required under CL §§14-1903, 14-1902(a)(1), and an additional $1,000 penalty as to each of those agreements for requiring an up-front fee in violation of CL §14-1902(6). The Deputy Commissioner accepted that recommendation.

to pay 57 Maryland consumers a total of $720,600 as treble damages.[12]

*Judicial Review*

BB&B and Mr. Brown sought judicial review of the agency decision in the Circuit Court for Baltimore City.  In the memorandum in support of their petition, BB&B and Mr. Brown contended:  (1) for a variety of reasons, the MCSBA did not apply to them; and (2) even if it did, any violations they committed were not willful.  After hearing legal arguments of the Commissioner and of BB&B and Mr. Brown on June 18 and July 29, 2014, the Circuit Court issued an order and memorandum opinion reversing the Commissioner's decision.  The Circuit Court concluded that, while BB&B and Mr. Brown may have violated the ethical rules governing attorneys, any loan modification they obtained would have been "ancillary" to their provision of legal services and their activities did not constitute a credit services business as defined in the MCSBA.  The Circuit Court did not address the issue of willfulness.

---

[12] Although not elaborated in the fact findings of the ALJ, she apparently concluded that BB&B had collected $252,200 from Maryland homeowners.  After reviewing the ALJ's Proposed Decision, the Deputy Commissioner concluded that there was insufficient factual evidence for amounts allegedly paid by some homeowners and reduced that figure to $242,200.  Trebling that figure should result in treble damages of $72<u>6</u>,600 rather than the figure of $72<u>0</u>,600 in the Final Order.  Thus, there may be an arithmetic error in the computation.  In any event, although a chart derived from BB&B's records that purported to document homeowner payments was introduced at the administrative hearing, neither the ALJ nor the Commissioner detailed how they arrived at their particular figures.

In their brief, BB&B and Mr. Brown also suggest that the treble damage figure in the Commissioner's order is based on an inaccurate computation of the total amount paid to the firm by Maryland homeowners.  However, they do not identify what they believe is the correct figure.

The Commissioner appealed, and, on October 23, 2015, the Court of Special Appeals affirmed the Circuit Court in an unreported opinion. We subsequently granted the Commissioner's petition for a writ of *certiorari*.

## II

### Discussion

It is undisputed that neither BB&B nor Mr. Brown obtained a license to operate a credit services business or otherwise complied with the various requirements in the MCSBA. The issue is whether they should have. To resolve that issue requires consideration of the following questions.

First, did the business activities of BB&B and Mr. Brown with respect to the Maryland homeowners with whom they entered into agreements during late 2008 and early 2009 come within the definition of a "credit services business" under Maryland law?

Second, if the answer to the first question is "yes," did BB&B or Mr. Brown qualify for the attorney exemption in the MCSBA?

In adopting, with minor changes, the ALJ's Proposed Decision, the Commissioner answered "yes" to the first question and "no" to the second. It is now our task to review those determinations.

### A. *Standard of Review*

When we review the final decision of an administrative agency, such as the decision made by the Commissioner in this case, we "look through" the circuit court's and intermediate appellate court's decisions, and evaluate the decision of the agency directly. *CashCall, Inc. v. Commissioner of Financial Regulation,* ___ Md. ___, ___, ___ A.3d ___

14

(2015). We look for whether there is substantial evidence in the record as a whole to support the agency's decision, and whether the agency's decision applies a correct interpretation of the law. *Bd. of Directors of Cameron Grove Condo., II v. State Comm'n on Human Relations*, 431 Md. 61, 80, 63 A.3d 1064 (2013). In the latter assessment, "the interpretation of a statute by the agency charged with administering the statute is entitled to great weight." *Adventist Health Care Inc. v. Maryland Health Care Comm'n*, 392 Md. 103, 119, 896 A.2d 320 (2006).

**B.      *Whether the Activities Came Within the Definition of "Credit Services Business"***

1.      Statutory Text

Any effort at statutory interpretation begins with the text of the statute. *Lockshin v. Semsker*, 412 Md. 257, 275, 987 A.2d 18 (2010). The MCSBA applies to a "credit services business," which the statute defines to include a "person who, with respect to the extension of credit by others . . . sells . . . or represents that such person can or will sell, provide, or perform . . . in return for the payment of money or other valuable consideration" the service of "[o]btaining an extension of credit for a consumer," where an "extension of credit" includes "the right to defer payment of debt . . . offered or granted primarily for personal, family, or household purposes." CL §14-1901(e)(1), (f).

This is precisely what BB&B and Mr. Brown did. Each of the agreements obligated the homeowner to pay several thousand dollars to BB&B. The agreements specified that, in consideration for that payment, BB&B was "to engage the appropriate party in discussions to renegotiate the terms of your [mortgage] loan." Renegotiating the key terms of a mortgage loan in distress means seeking to modify such terms as the principal, the

15

interest rate, and the length of the loan term. It may involve forgiveness of past due mortgage payments, moving missed payments to the end of the loan, recapitalization of the loan, or any number of other mechanisms that defer all or part of the debt in some manner. Modification of a mortgage loan in default inevitably results in some form of deferral. Thus, renegotiating the terms of a mortgage loan in distress is "obtaining an extension of credit" as defined in MCSBA because it would involve some form of deferral of the original payment terms.

Finally, a home mortgage loan is debt primarily for personal, family, or household (as opposed to, for example, commercial or business) purposes. Accordingly, renegotiating the terms of a mortgage loan involves seeking "the right to defer payment of debt . . . offered or granted primarily for personal, family, or household purposes," which is an extension of credit according to CL §14-1901(f). As the firm and its attorneys, including Mr. Brown, undertook to obtain such an extension of credit in exchange for the payment of money, they met the general definition of a "credit services business" in CL §14-1901(e)(1).[13]

---

[13] BB&B and Mr. Brown have, at times, contended that their agreements were inaccurately phrased, because the lawyers at BB&B did not intend to do some of the things that the agreements said that they would do. Whether an agreement was poorly phrased is not relevant to this case, though. The statutory language includes those who "represent" that they will engage in the actions described in the statute, and the agreements certainly "represented" that BB&B would do what the agreements said, whether or not BB&B actually did or intended to do any of those things.

2.     Legislative History

Although the text of the statute encompasses the agreements between BB&B and Maryland homeowners, it is appropriate to examine the legislative history of the statute for at least two reasons. First, we may consult legislative history to confirm our understanding of apparently unambiguous text. *Hammonds v. State*, 436 Md. 22, 44, 80 A.3d 698 (2013). Second, in this case, BB&B and Mr. Brown argue that the General Assembly actually intended that the MCSBA cover only credit repair agencies, and therefore it should not cover them. Although this argument has no basis in the language of the statute, we shall also consider it in our examination of the legislative history.

*MCSBA (1987 – 2010)*

The General Assembly, inspired by model legislation suggested by the Council of State Governments in 1986 (which in turn was inspired by California's Credit Services Act of 1984[14]), enacted the MCSBA in 1987. Chapter 469, Laws of Maryland 1987; *see* Council of State Governments, Suggested State Legislation (vol. 45) (1986); California Civil Code §1789.10 *et seq.* This Court previously reviewed the legislative history of the enactment of the MCSBA and the subsequent amendment of the statute in 2001, 2002, and 2010 in *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 164-69, 46 A.3d 443 (2012). After reviewing that history, the Court concluded that, while the original enactment was

---

[14] California has never considered the issue in this case because its attorney exemption is broader. *See* California Civil Code §1789.12(b)(5).

17

primarily aimed to regulate credit repair agencies, the subsequent amendments extended the reach of the MCSBA to payday lenders and others.  427 Md. at 161-62, 169.

In particular, the post-1987 amendments prohibited a credit services business from "[c]harg[ing] or receiv[ing] any money or other valuable consideration in connection with an extension of credit that, when combined with any interest charged on the extension of credit, would exceed the interest rate permitted for the extension of credit under the applicable title of this article."[15]  CL §14-1902(7).  As this Court concluded in *Gomez*, because many of the amendments seemed directed at payday lenders, the MCSBA's legislative history suggests that the MCSBA is not limited to "ordinary credit repair services."  *Gomez*, 427 Md. at 169.  Rather, it is intended to provide broad protection to consumers of credit services.  A report of the Senate Finance Committee concerning the 2002 amendment of the statute explained that the amendment was intended to close a perceived loophole and apply the statute to "any extension of credit."  Floor Report of Senate Finance Committee concerning House Bill 1193 (2002) (emphasis in original).  The MCSBA, as amended over the past two decades, is not intended to regulate only credit repair agencies or payday lenders; its reach is broader.

---

[15] This prohibition took place in stages.  In 2001, the Legislature added a prohibition against "assist[ing] a consumer to obtain an extension of unsecured closed end credit at a rate of interest which, except for federal preemption of State law, would be prohibited under" Maryland law.  Chapter 630, Laws of Maryland 2001.  In 2002, all other extensions of credit were included.  Chapter 561, Laws of Maryland 2002.  In 2010, the General Assembly clarified that fees associated with a payday loan also fell under the usury caps, putting the statute in its present form.  Chapter 385, Laws of Maryland 2010.

*MARS Act (2013)*

The legislative history of the MCSBA after the time period relevant to this case provides another important clue. In 2013, the General Assembly enacted the Maryland Mortgage Assistance Relief Services ("MARS") Act. Chapter 465, Laws of Maryland 2013, *codified at* Maryland Code, Real Property Article, §7-501 *et seq.* That legislation regulated "mortgage assistance relief providers," incorporating various definitions from federal law. Under the incorporated federal definitions, "mortgage assistance relief" includes the renegotiation or modification of a mortgage loan. *See* 12 CFR §1015.2. As part of the same bill, the General Assembly added a corresponding exemption to the MCSBA, codified at CL §14-1901(e)(3)(x) ("Beginning July 1, 2013, a mortgage assistance relief service provider regulated under [the MARS Act]" is exempt from the definition of "credit services business.").

The addition of this new exemption to the MCSBA to exclude those regulated by the MARS Act indicates that the General Assembly believed that those who offer to obtain loan modifications for homeowners would otherwise be covered by the MCSBA. If that were not true, the new exemption in CL §14-1901(e)(3)(x) would be unnecessary.[16]

---

[16] The MARS Act also contained a savings provision that indicated that the bill was not intended to affect the Commissioner's enforcement authority under MCSBA, as that authority pertained to the period prior to the effective date of the MARS Act:

> [The MARS Act is] not intended, and may not be construed, to have any effect on the authority of the Commissioner of Financial Regulation to regulate mortgage assistance relief service providers under [the MCSBA] or on any enforcement actions, including litigation, taken under that authority

### 3. Summary

Under the plain meaning of the text of the MCSBA, a person who offers to renegotiate a mortgage loan for a homeowner facing foreclosure is offering to assist a consumer in obtaining an extension of credit. If the person does so in return for the payment of money by the consumer, the person falls within the definition of "credit services business" under the statute. The legislative history of the MCSBA and the related MARS Act confirm that reading.

We are not alone in this legal interpretation. Although we have not had occasion previously to assess whether a mortgage loan modification involves an extension of credit within the meaning of the MCSBA, the federal District Court for the District of Maryland has done so on several occasions and reached the same conclusion that we do here.[17]

---

as it existed and based on actions that occurred before the effective date of this Act.

Chapter 465, §2, Laws of Maryland 2013. Thus, regardless of any changes to the Commissioner's authority that the MARS Act made going forward, the Commissioner may still take actions based on the Commissioner's regulatory and enforcement authority under the MCSBA as it existed before the MARS Act. In other words, if a person who offered to obtain mortgage loan modifications violated the MCSBA before the MARS Act was enacted, but now would be exempt from the MCSBA under the MARS Act, that person is not exempt from the MCSBA for past violations, and the Commissioner may still enforce the MCSBA against that person. This savings provision reinforces the conclusion that a mortgage assistance relief service provider would likely qualify as credit services business under the MCSBA as it existed before enactment of the MARS Act.

[17] *See Cabeza v. Richey Law & Associates*, 2014 WL 4635381 (D. Md. 2014) (out-of-state law firm, and its managing attorney, who offered to assist Maryland homeowners facing foreclosure in obtaining mortgage loan modification engaged in a "credit services business" as defined in the MCSBA); *Robinson v. Nationstar Mortgage, LLC*, 2015 WL 4994491 (D. Md. 2015) at *3 n.2 (concluding that, under the MCSBA, the "definition [of

Finally, the Commissioner, who is charged by State law with administering and enforcing the statute, has adopted that interpretation in other enforcement actions and advisory notices concerning the statute.[18]

Thus, in offering, in return for the payment of money,[19] to assist Maryland homeowners facing foreclosure with renegotiating their mortgage loans to obtain a loan modification, BB&B and Mr. Brown's activities came within the general definition of "credit services business" in the MCSBA. Of course, this does not resolve the question as to whether the MCSBA applies to particular transactions. One must still consider whether any of the 10 exemptions in the statute applies – in this case, the attorney exemption.

---

"extension of credit"] plainly encompasses a loan modification"); *see also Marchese v. JP Morgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 466 (D. Md. 2013); *Barry v. EMC Mortgage Corp.*, 2012 WL 3595153 (D. Md. 2012); *Allen v. CitiMortgage, Inc.*, 2011 WL 3428665 (D. Md. 2011).

[18] *See* Commissioner of Financial Regulation, Enforcement Actions and Consent Orders, http://www.dllr.state.md.us/finance/consumers/enforcement.shtml (last visited July 26, 2016) (listing enforcement actions under MCSBA); Commissioner of Financial Regulation, Advisory Notice – Loss Mitigation Consulting, Foreclosure Prevention, Mortgage Loan Modification, and Similar Services under the Maryland Credit Services Business Act (MCSBA) and the Protection of Homeowners in Foreclosure Act (PHIFA) (rev. February 20, 2009) http://www.dllr.state.md.us/finance/advisories/advisory9-08.shtml (last visited July 26, 2016).

[19] This case is thus distinguishable from *Gomez* in that there was no direct payment from the consumer to the tax preparer in connection with the refund anticipation loan in that case. Although the Court has subsequently limited the extent of that rationale, *see CashCall, Inc., supra* ___ Md. at ___, there is no question that the Maryland homeowners made direct payments to the Respondents here. Indeed, the agreements explicitly recited that the homeowners' payments were made "in consideration" for loan renegotiation services.

## C.    *Whether the Attorney Exemption Applied*

In order to come within the attorney exemption of the MCSBA, an individual must satisfy its three prongs:  (1) the individual must be admitted to the Bar of the Court of Appeals of Maryland, (2) the individual must render the services within the course and scope of practice by the individual as a lawyer, and (3) the individual must not engage in the credit services business "on a regular and continuing basis."  *See* CL §14-1901(e)(3)(vi).  Because the statute uses the conjunction "and," all three prongs must be met in order for the attorney exemption to apply.

In relation to the third prong,[20] the ALJ found that "BB&B and the attorneys it employed were engaging in credit services business on a regular and continuing basis." The ALJ based this determination on the fact that BB&B entered into 57 agreements with Maryland homeowners during the nine months between June 11, 2008, and March 12, 2009, including 53 in a seven-and-one-half month period.  The finding is also supported by the fact that hundreds of other Maryland homeowners consulted with the firm about entering into such an agreement.  While the statute does not define the phrase "regular and continuing," the ALJ found that "when a small out-of-state law firm has 57 cases with

---

[20] In relation to the first prong – "admitted to the Bar of the Court of Appeals of Maryland" – the Commissioner points out that Mr. Brown has never been admitted to the Maryland Bar.  Respondents reply that, because BB&B employed an attorney admitted to the Maryland Bar during most of the period, the firm qualified for the attorney exemption, and because BB&B qualified, so did Mr. Brown.  We need not resolve this question, however, as BB&B and Mr. Brown failed to carry their burden of proof as to the third prong of the exemption.

22

Maryland consumers in nine months, it constitutes offering the particular services on a regular and continuing basis."

A Maryland attorney who counsels an individual client facing foreclosure and attempts to negotiate a mortgage loan modification would thus ordinarily be exempt from the MCSBA. As the ALJ suggested in her Proposed Decision (adopted by the Commissioner), there may be cases where there is a significant question at what point an attorney who frequently provides such services has crossed the line into providing "regular and continuing" credit services. That, however, is not this case. The consultations and agreements with Maryland homeowners seeking loan modifications were not only a very significant part of the firm's business during the months in question, but also accounted for most of the work of its Maryland-licensed attorney by the time he left the firm. Thus, there was substantial evidence supporting the conclusion that BB&B and Mr. Brown engaged in a credit services business on a regular and continuing basis.

Citing a Circuit Court decision in another case,[21] BB&B and Mr. Brown argue that "regular and continuing basis" includes only those whose primary business is credit services. The thrust of their argument is that the category "law firm" (or "lawyer") and the

---

[21] *Law offices of Daniel E. Radebaugh LLC v. Maryland,* Case No. 03-C-11-001890, Circuit Court for Baltimore County (Feb. 16, 2012). Respondents also rely on a one-paragraph order issued in a case in the Circuit Court for Baltimore City. *In re Law Offices of Perry and Associates, et al.*, Case No. 24-C-12-002031, Circuit Court for Baltimore City (October 18, 2012). Quite apart from the fact that it is not a reported appellate opinion and therefore does not qualify as precedent or persuasive authority under Maryland Rule 1-104, that order neither recites facts nor provides any analysis that might pertain to this case.

23

category "credit services business" are mutually exclusive: one who is primarily engaged in the practice of law is not engaged in credit services on a regular and continuing basis.[22] However, this argument is inconsistent with ordinary principles of statutory interpretation for at least two reasons.

First, Respondents' reading of the statute ignores the third prong and would render it entirely superfluous. If all lawyers practicing law qualify for the attorney exemption, we need consider only whether the lawyer is admitted to the Bar of the Court of Appeals of Maryland and whether the lawyer rendered the services in question within the course and scope of practice by the individual as a lawyer.[23] The third prong — whether the lawyer

---

[22] There is no question that BB&B was a legitimate Virginia law firm founded by a distinguished member of the bar of that state. But it is also apparent that it seized what it perceived as a business opportunity generated by the Great Recession of 2008-2009 and temporarily operated a "credit services business" under Maryland law until it ceased taking referrals of Maryland homeowners in March 2009.

[23] Although BB&B and Mr. Brown have not adopted it as one of their arguments before us, the Court of Special Appeals in its opinion expressed some concern that certain requirements in the MCSBA would not appear to apply to a lawyer negotiating loan modifications for homeowners facing foreclosure. Most of these requirements concern disclosure of information to consumers concerning their rights vis-a-vis consumer reporting agencies, which are defined in the statute as a person or company that creates credit reports for third-party lenders. *See* CL §14-1901(d), CL §14-1201. While such information is most directly relevant to those with bad credit who are seeking to repair their credit using a credit repair agency, there is no reason that anyone working with a consumer trying to improve the consumer's debt situation — as a consumer seeking a loan modification is — could not provide this information as well. Consumers with debt problems could benefit from information about consumer reporting agencies because actions related to debt can affect credit reports intentionally or unintentionally, and uninformed consumers may be at risk of accidentally damaging their credit scores. Also, consumers who are not familiar with the practices of a consumer reporting agency may decide to investigate their credit reports and correcting information in a credit report could potentially assist in seeking a loan modification.

engages in the credit services business on a regular and continuing basis — would not be a factor at all. We do not ordinarily read statutes so as to render portions superfluous, *In re Adoption/Guardianship of Tracy K.*, 434 Md. 198, 206, 73 A.3d 1102 (2013), and we will not do so here.

Second, as described above, the MCSBA is ultimately derived from a similar California statute, the Credit Services Act of 1984, which the Council of State Governments included in its 1986 suggested state legislation. As enacted in 1984,[24] the California Credit Services Act defines a "credit services organization" in a fashion nearly identical to a "credit services business" under Maryland law, and it also contains an attorney exemption that applies to "[a]ny person licensed to practice law in this state where the person renders services within the course and scope of his or her practice as an attorney

---

These circumstances are thus distinguishable from those in *Gomez*, where this Court held that a tax preparer who helped a consumer obtain a "refund anticipation loan" – that is, a loan for the value of a taxpayer's expected tax refund usually offered about ten days before the tax refund will arrive – was not a "credit services business" under the MCSBA, in part because the requirements of the MCSBA "do not logically apply" to a tax preparer who facilitates refund advance loans. 427 Md. at 134 n.4, 156-58. Ultimately, a tax preparer is not seeking to aid consumers with their debt. Rather, a tax preparer seeks to aid consumers with filing their taxes. So these requirements would be odd for a tax preparer, even one who helps a consumer obtain a refund advance loan as in *Gomez*. In this case, however, these requirements could well apply to a lawyer seeking a loan modification for a consumer. In any event, "the inapplicability of certain provisions [of the statute] would not necessarily negate the applicability of the entire statute." *Gomez*, 427 Md. at 156 n.26. Were we to hold that the MCSBA did not apply in these circumstances we would be imputing a broader attorney exemption into the statute than the Legislature wrote.

[24] Amendments to the statute in 1992 and subsequent years have changed the wording somewhat. *See* Cal. Civ. Code §1789.12.

25

at law." The recommended legislation from the Council of State Governments is nearly identical.

However, the General Assembly did not adopt this language verbatim. The main textual difference between the original attorney exemption (in California's 1984 legislation and the Council of State Governments' suggested state legislation) and the subsequent Maryland attorney exemption is that the original attorney exemption did not contain a third prong; the General Assembly specifically added the additional restriction that an individual is exempt only when the individual "does not engage in the credit services business on a regular and continuing basis."

That is, the General Assembly based the MCSBA on a statute that exempted all lawyers practicing law, but it specifically chose to add an additional limitation to the exemption so as *not* to exempt all lawyers practicing law. We can understand this only as reflecting an intent that some Maryland lawyers will be covered by the MCSBA, specifically those lawyers who regularly engage in activities that meet the definition of "credit services business," even if they are also practicing law.[25]

---

[25] As the Circuit Court and Court of Special Appeals suggested, the conduct of Mr. Brown and the other attorneys at BB&B may also be subject to sanction as the unauthorized practice of law or as a violation of the rules of professional conduct applicable to lawyers in Maryland or Virginia. Of course, the potential for professional disciplinary action would not immunize them from other laws that regulate the same conduct. A law license is not itself an exemption from other laws that apply to all. *See, e.g., Attorney Grievance Commission v. Nussbaum*, 436 Md. 609, 84 A.3d 98 (2014) (attorney who colluded with competitors in tax liens in the course of his legal practice prosecuted for antitrust violations and also sanctioned under the rules of professional conduct).

26

In the end, neither BB&B nor Mr. Brown established that they qualified for the attorney exemption. There was substantial evidence to support the ALJ's finding and the Commissioner's conclusion: the attorney exemption does not apply to BB&B or Mr. Brown, because they engaged in credit services business activities during this period on a regular and continuing basis.

### III

### Conclusion

For the reasons set forth above, we hold that the Commissioner accurately construed the MCSBA in this case and that there was substantial evidence in the administrative record that: (1) the activities of BB&B and Mr. Brown in regard to the agreements they entered into with Maryland homeowners during late 2008 and early 2009 came within the definition of "credit services business" in the MCSBA; and (2) they conducted those activities on a "regular and continuing basis" during that period and therefore did not qualify for the attorney exemption in the statute.

As noted above, in addition to arguing that the MCSBA did not apply to them, BB&B and Mr. Brown also contended in their petition for judicial review that there was insufficient evidence that any violations were "willful." Relying on a Court of Special Appeals decision that considered various meanings of "willful," the ALJ concluded that violations of BB&B and Mr. Brown satisfied one of those definitions. On the other hand, the ALJ also found that "[t]here was no evidence to prove that [they were] aware of the governing Maryland statutes and deliberately ignored them." Because the Circuit Court concluded that the statute did not apply to them, it appropriately did not address the

question of willfulness. Nor was the issue of willfulness briefed or argued on appeal.

Because we have come to a different conclusion than the Circuit Court on the applicability

of the MCSBA, it would now be appropriate for the Circuit Court to address the issue of

willfulness on remand.[26]

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND REMAND THE CASE TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY RESPONDENTS.**

---

[26] To the extent there is truly a question as to whether there is substantial evidence to support the amount that the Commissioner found that homeowners paid to BB&B, see footnote 12 above, it may be considered on remand in conjunction with the Circuit Court's consideration of the willfulness issue.