*Nagle & Zaller, P.C., et al. v. Jahmal E. Delegall, et al.*, Misc. No. 6, September Term, 2021, Opinion by Booth, J.

**MARYLAND CONSUMER LOAN LAW** — A law firm that engages in debt collection activities on behalf of a client, including the preparation of a promissory note containing a confessed judgment clause and the filing of a confessed judgment complaint to collect a consumer debt, is not subject to the Maryland Consumer Loan Law, Md. Code (2013 Repl. Vol., 2021 Supp.), Commercial Law Article § 12-301, *et seq.* and Md. Code (2020 Repl. Vol, 2021 Supp.), Financial Institutions Article § 11-201, *et seq.*

United States District Court for the
District of Maryland
Case No.: 8:20-cv-0626-PWG
Argued: December 6, 2021

IN THE COURT OF APPEALS
OF MARYLAND

Misc. No. 6

September Term, 2021

NAGLE & ZALLER, P.C., et al.

v.

JAHMAL E. DELEGALL, et al.

*Getty, C.J.,
*McDonald,
Watts,
Hotten,
Booth,
Biran,
Gould,

JJ.

Opinion by Booth, J.
Watts, J., dissents.

Filed: August 11, 2022

*Getty, C.J. and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case comes to us from the United States District Court for the District of Maryland (the "federal court") pursuant to a certification order[1] requesting that we answer the following question, which we have rephrased:[2]

> Is a law firm that engages in debt collection activities on behalf of a client, including the preparation of a promissory note containing a confessed judgment clause and filing of a confessed judgment complaint to collect a consumer debt, subject to the provisions of the Maryland Consumer Loan Law, Md. Code, Commercial Law Article § 12-301, *et seq.*?

As we explain below, the answer to that question is "no."

In connection with our consideration of the question of law presented herein, we accept as true the following facts as set forth in the operative complaint filed in the federal court, which was incorporated by reference into the federal district court's certification order.[3]

---

[1] Under the Maryland Uniform Certification of Questions of Law Act, Md. Code (2020 Repl. Vol., 2021 Supp.), Courts and Judicial Proceedings Article ("CJ") § 12-601, *et seq.*, the court certifying the question shall issue a certification order containing "(1) [t]he question of law to be answered; [and] (2) [t]he facts relevant to the question, showing fully the nature of the controversy out of which the question arose[.]" CJ § 12-606(a).

[2] Pursuant to CJ § 12-604, we may reformulate a question of law so long as our answer properly disposes of the question as certified. *See Rauch v. Allstate Ins. Co.*, 388 Md. 690 (2005). The certified question contained in the certification order is as follows:

> The Maryland Consumer Loan Law, Md. Code Ann., Commercial Law § 12-301, et seq., applies to consumer "loans" made by "lenders," and requires a "person engaged in the business of making loans" to be licensed. Based upon the allegations in the Third Amended Complaint, is Nagle & Zaller, P.C. subject to the statute?

[3] In responding to a certification from another court, this Court accepts the facts provided by the certifying court. *See, e.g.*, *Price v. Murdy*, 462 Md. 145, 147 (2018). We resolve only issues of Maryland law, not questions of fact. *Parler & Wobber v. Miles & Stockbridge*, 359 Md. 671, 681 (2000).

# I

## Background

This case arises from debt collection activity by Nagle & Zaller, P.C. ("Nagle & Zaller"), a law firm, on behalf of its clients. The clients are homeowners associations and condominium regimes (collectively, "HOAs")[4] that retain Nagle & Zaller to undertake collection efforts against lot owners in HOAs and unit owners in condominium regimes (collectively, "homeowners") seeking to recover delinquent assessments. The HOAs retained Nagle & Zaller to represent them in negotiating and drafting promissory notes with homeowners that memorialized the repayment terms of the delinquent assessments. The promissory notes drafted by Nagle & Zaller included confessed judgment clauses.[5]

_____

[4] As set forth in note 6 *infra*, the initial lawsuit apparently included homeowners associations that were clients of Nagle & Zaller. Other defendants, such as Vineyards Condominium, appear to be condominium regimes organized under the Maryland Condominium Act, Md. Code (2015 Repl. Vol., 2021 Supp.), Real Property Article ("RP") § 11-101, *et seq*. Because the operative complaint collectively refers to these various entities as "Homeowners Associations" notwithstanding the fact that some of the entities appear to be condominium regimes, we shall do the same. As we explain more fully herein, our analysis is the same regardless of whether the assessments are imposed under the Maryland Homeowners Association Act or the Maryland Condominium Act.

[5] According to the allegations in the Complaint, the promissory note, signed by Jahmal E. Delegall and prepared by Nagle & Zaller, contained the following confessed judgment clause:

> In the event of default of any payment due hereunder, this Promissory Note shall, at the option of the Holder hereof, become immediately due and payable in full. Maker, and any other party at any time liable hereunder, waives presentment, demand and presentation for payment, notice of nonpayment and dishonor, protest and notice of protest, and expressly agrees this Promissory Note or any payment hereunder may be extended from time to time without in any way affecting the liability of the Maker or such other party. The Maker, and any other party at any time liable hereunder, hereby

2

When homeowners defaulted on their obligations, Nagle & Zaller filed confessed judgment complaints against them.

In February 2018, Jahmal E. Delegall and others filed a putative class action against Nagle & Zaller in the Circuit Court for Montgomery County challenging the law firm's above-described debt collection practices. After the plaintiffs filed an amended complaint adding the HOA clients of the law firms as defendants, the defendants removed the case to the federal court.

After some procedural twists and turns,[6] in August 2020, Jahmal E. Delegall and Hadassah Sanders (hereinafter collectively referred to as "Delegall") filed a Third

---

authorizes and empowers any attorney of any Court of record to appear in any Court of competent jurisdiction in the State of Maryland or any Court of competent jurisdiction in the United States, any time after payment is due hereunder, whether by acceleration or otherwise, and confess judgment without process in favor of the Holder hereof against the Maker, and any other party at anytime liable hereunder, for such amount as may be due hereunder, together with the costs of such proceedings and attorney's fees of fifteen percent (15%) of the amount unpaid hereunder.

[6] According to the certification order, the initial putative class action was filed in the Circuit Court for Montgomery County by Mr. Delegall, along with co-plaintiff Natalie Thomas, and was titled *Thomas v. Cameron Mericle, P.A.* ("*Thomas*"). The plaintiffs asserted claims against Nagle & Zaller and another law firm. The complaint was amended in June 2018 to add homeowner association ("HOA") clients of the law firms as defendants. In October 2018, the plaintiffs filed a second amended complaint, adding violations of federal law. Thereafter, in November 2018, the defendants removed the case to federal court on the basis of federal question jurisdiction.

Following a partial class-action settlement in *Thomas*, in March 2020, the federal court granted a motion to sever the claims against Nagle & Zaller and Vineyards Condominium, one of Nagle & Zaller's clients, from *Thomas*, into the pending federal case from which this certified question has been raised. In August 2020, plaintiffs filed the operative Third Amended Complaint, which added Hadassah Saunders as an additional named plaintiff. For simplicity's sake, we refer to the Third Amended Complaint as the

3

Amended Complaint against Nagle & Zaller and its client, Vineyards Condominium, which is the operative complaint (the "Complaint"). Although the Complaint includes several counts,[7] in connection with the certified question, we are only concerned with one count—Count VIII—which alleges that Nagle & Zaller violated the Maryland Consumer Loan Law ("MCLL"), Md. Code (2013 Repl. Vol., 2021 Supp.), Commercial Law Article ("CL") § 12-301, *et seq.*, and Md. Code (2020 Repl. Vol, 2021 Supp.), Financial Institutions Article ("FI") § 11-201, *et seq.*

For purposes of that count, Delegall alleges that the HOAs and Nagle & Zaller are "Lenders" as that term is defined in CL § 12-301(c), but that neither the HOAs nor Nagle & Zaller "are licensed to make loans" under the MCLL. Because they were not licensed to make loans, Delegall asserts that the promissory notes are void and unenforceable, and that the HOAs and Nagle & Zaller cannot collect or retain any payments made on them. In other words, because the HOAs and Nagle & Zaller lack a license under the MCLL, the debt memorialized in the promissory note, including the principal delinquent amount owed, is uncollectible. *See* CL § 12-314(b)(1) and (2) (stating that a "person may not receive or retain any principal, interest, fees, or other compensation with respect to any loan that is

---

"Complaint." Since the filing of the Complaint, Mr. Delegall has settled his claims against Vineyard Condominium so that only the claims against Nagle & Zaller remain.

[7] The additional counts in the eight-count Complaint are: Count I (Violation of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Commercial Law ("CL") § 14-202(8)); Count II (Negligent Misrepresentation); Count III (Money Had and Received); Count IV (For a Declaratory Judgment pursuant to Md. Code Courts and Judicial Proceedings ("CJ") § 3-409); Counts V and VI (Violations of the Federal Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692f and 1692e); and Count VII (Violations of the Maryland Consumer Protection Act ("MCPA"), CL § 13-101, *et seq.*).

4

void and unenforceable under this subtitle[]" and that a loan is void and unenforceable if "a person who is not licensed under or exempt from the licensing requirements under Title 11, Subtitle 2 of the Financial Institutions Article made the loan[]").

Nagle & Zaller filed a motion to dismiss the Complaint, alleging, in part, that the MCLL does not apply to the debt collection activities as alleged in the Complaint. Because there are no Maryland appellate court decisions referencing or interpreting whether a law firm that undertakes debt collection activity is required to be licensed under the MCLL under these circumstances, the parties filed a joint motion to certify a question of law, requesting that the federal court enter an order certifying the question to this Court. In July 2021, the federal court entered a certification order requesting that we answer the certified question set forth above.

Nagle & Zaller contends that the General Assembly did not intend to require that law firms or HOAs obtain a license to engage in transactions of this nature because neither the law firms nor their HOA clients are "lenders" who "engage in the business of making loans" under the MCLL, CL § 12-302. For its part, Delegall contends that the promissory notes constitute "loans" because they are an extension of credit enabling the homeowners to pay delinquent debts owed to the HOAs, and the law firm is "making the loans." Delegall asserts that, under the broad, general definitions contained in the MCLL, the transactions are subject to the MCLL. Because neither the law firm nor the HOAs are licensed to make the loans, Delegall asserts that the promissory notes are void and unenforceable. In large part, Delegall relies upon our decision in *Goshen Run Homeowners Association, Inc. v. Cisneros*, 467 Md. 74 (2020), in which we held that promissory notes

5

like the ones at issue here are extensions of consumer credit that fall within the purview of a different statute—the MCPA.

## II

## Discussion

Before we turn to the question at hand, it is useful to discuss the underlying transaction and the applicable laws that govern the payment of HOA assessments and charges. In *Goshen Run*, we observed that HOAs "are often placed in a difficult situation of having to undertake collection efforts against lot owners in their communities for delinquent homeowners assessments." 467 Md. at 80. We noted that, "[t]o address the problem, the General Assembly has provided HOAs with multiple collection tools" that are outlined in the Maryland Homeowners Association Act, including the HOA's ability to collect delinquent assessments through both *in rem* proceedings under the Maryland Contract Lien Act, as well as *in personam* proceedings at law. *Id.* Because similar tools are available to the governing body of a condominium regime, it is useful to touch upon those statutory provisions as well.

### A. *Right of a Governing Body of a HOA and Condominium Regime to Collect Delinquent Assessments*

#### 1. *The Maryland Homeowners Association Act*

The Maryland Homeowners Association Act ("HOA Act") is set forth in Maryland Code (2015 Repl. Vol., 2021 Supp.), Real Property Article ("RP") § 11B-101, *et seq.* The HOA Act applies to real property lots in a development community that are subject to a

declaration of a HOA and also provides the legislative framework under which HOAs[8]

operate and manage their affairs. RP § 11B-102. A HOA is governed by its governing

body[9] in accordance with its declaration,[10] as well as other corporate documents such as its

bylaws, and rules and regulations promulgated and adopted in accordance with the

declaration and other governing documents.

The HOA Act contains provisions which address many operational and governance

aspects of a development that are subject to a HOA declaration, such as the notice or

conduct of meetings of the HOA or its governing body, requirements for maintaining books

and records of the association, and the establishment of an annual budget for the repair and

maintenance of the common areas. RP §§ 11B-111, 11B-112, and 11B-112.2.

In connection with the establishment of a budget, the HOA has the authority to adopt

assessments and charges to cover expenses for maintaining and repairing common areas.[11]

---

[8] "Homeowners association" is defined under the HOA Act as "a person having the authority to enforce the provisions of a declaration" and "includes an incorporated or unincorporated association." RP § 11B-101(i).

[9] "Governing body" is defined as the "homeowners association, board of directors, or other entity established to govern the development." RP § 11B-101(h).

[10] The declaration of a HOA is the genesis of its authority. The HOA Act defines the "declaration" as: "an instrument, however denominated, recorded among the land records of the county in which the property of the declarant is located, that creates the authority for a homeowners association to impose on lots, or on the owners or occupants of lots, . . . any mandatory fee in connection with the provision of services or otherwise for the benefit of some or all of the lots, the owners or occupants of lots, or the common areas." RP §11B-101(d)(1).

[11] Under the HOA Act, "common areas" are defined as "property which is owned or leased by a homeowners association." RP § 11B-101(b).

Under its declaration, the HOA can establish and impose on any lot, or on the owners or occupants of any lot, mandatory assessments or fees to cover "the provision of services or otherwise for the benefit of some or all of the lots, the owners or occupants of lots, or the common areas." RP § 11B-101(d)(1).

Section 11B-117(a) of the HOA Act states that, "[a]s provided in the declaration, a lot owner shall be liable for all homeowners association assessments and charges that come due during the time that the lot owner owns the lot." To encourage the timely payment of assessments, the HOA Act gives the HOA the authority to establish in its declaration or bylaws "a late charge of $15 or one-tenth of the total amount of any delinquent assessment or installment, whichever is greater, provided the charge may not be imposed more than once for the same delinquent payment and may be imposed only if the delinquency has continued for at least 15 calendar days." RP § 11B-112.1.

With respect to enforcement, the HOA Act permits a HOA to establish provisions in its declaration for collection of delinquent assessments through both *in rem* and *in personam* proceedings. "The express language of the HOA Act authorizes the governing body of a HOA to take enforcement action to collect delinquent assessments and charges owed by the individual lot owners within the development." *Goshen Run*, 467 Md. at 93. "As part of its collection efforts, the HOA is authorized to assess late charges, to impose a lien on the lot in accordance with the Maryland Contract Lien Act, [RP] § 14-201[,] *et seq.* (2013), and to file suit against the individual lot owner for the amount of the debt owed." *Id.*

8

### 2. *The Maryland Condominium Act*[12]

The Maryland Condominium Act, RP § 11-101, *et seq.* regulates the formation, management, and termination of condominiums in Maryland. A condominium is a "communal form of estate in property consisting of individually owned units which are supported by collectively held facilities and areas." *Ridgely Condominium Ass'n, Inc. v. Smyrnioudis*, 343 Md. 357, 358 (1996) (internal citations omitted). "A condominium owner, therefore, holds a hybrid property interest consisting of an exclusive ownership of a particular unit or apartment and a tenancy in common with the other co-owners in the common elements." *Id.* at 358–59 (footnote omitted).[13]

Under the Maryland Condominium Act, property becomes a condominium upon the recording of a declaration, bylaws, and a condominium plat. RP § 11-102. The bylaws govern the administration of the condominium and must include the form of the condominium administration and its powers, meeting procedures, and fee collection procedures. RP § 11-104(a), (b). The Council of Unit owners, which may delegate its powers to a Board of Directors, governs the affairs of the condominium and may adopt rules for the condominium. RP §§ 11-109(a), (b), 11-111(a). The Council of Unit Owners

---

[12] As set forth in note 4, the Complaint refers to Nagle & Zaller's clients as "HOAs" despite the fact that some of them appear to have been established as condominium regimes. We briefly discuss the Maryland Condominium Act because a unit owner is subject to similar assessments and charges as a lot owner in a HOA. The governing body of the condominium regime—a council of unit owners or a board of directors—has similar powers and authority to impose and collect assessments.

[13] The Maryland Condominium Act defines "common elements" as "all of the condominium except for the units." RP § 11-101(c)(1).

has the obligation to establish an annual budget, which shall include, among other things, maintenance costs of the common areas and utilities. RP § 11-109.2(a), (b).

The Council of Unit Owners has the authority to adopt assessments and charges to cover the cost of maintaining and repairing the common areas. The Condominium Act states that "[a] unit owner shall be liable for all assessments, or installments therefore, coming due while he is the owner of a unit," RP § 11-110(c), and that "[p]ayment of assessments, together with interest, late charges, if any, costs of collection and reasonable attorney's fees may be enforced by the imposition of a lien on a unit in accordance with the provisions of the Maryland Contract Lien Act." RP § 11-110(d)(1). Any assessment that is not paid when due bears interest at a rate of 18% per annum, unless a lower rate of interest is established in the bylaws. RP § 11-110(e). Like the HOA Act, the Condominium Act also states that the "bylaws may provide for a late charge of $15 or one tenth of the total amount of any delinquent assessment or installment, whichever is greater, provided that the charge may not be imposed more than once for the same delinquent payment and may only be imposed if the delinquency has continued for at least 15 calendar days." *Id.*

### B. Homeowners' Remedies Where Governing Body's Collection Efforts Do Not Comply with State Consumer Protection Laws

Although the governing body of an HOA or a condominium regime has the statutory right to collect delinquent assessments, interest, and fees, the exercise of such rights must be undertaken in conformance with the organization's respective bylaws and organizational documents, as well as applicable state laws. Similarly, the governing body's efforts to collect the debts must comply with the applicable federal and state consumer

protection statutes, including the Maryland Consumer Protection Act ("MCPA"), which is set forth in CL § 13-101, *et seq.* As noted above, in *Goshen Run*, we specifically held that the collection of HOA assessments through confessed judgment clauses in promissory notes violates the MCPA. 467 Md. 74. Delegall relies extensively on our analysis and holding in *Goshen Run* as support for the position that law firms and HOAs that undertake debt collection activity through the use of confessed judgment clauses similarly violate the MCLL—a separate and distinct statutory scheme that governs small consumer loan businesses. Given Delegall's reliance on *Goshen Run* and the application of the MCPA to the types of transactions that are at issue in this case, it is useful to discuss the scope of the statute and our holding in that case.

The purpose of the MCPA is to "set certain minimum statewide standards for the protection of consumers across the State." CL § 13-102(b)(1). In enacting the MCPA, the General Assembly intended to "take strong protective and preventive steps to investigate unlawful consumer practices, to assist the public in obtaining relief from these practices, and to prevent these practices from occurring in Maryland." CL § 13-102(b)(3). The MCPA generally prohibits unfair, abusive, or deceptive trade practices in consumer transactions,[14] and the Act sets forth a non-exhaustive list of prohibited practices. *See* CL

---

[14] Under CL § 13-101(c)(1) and (2), a "consumer" is defined as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit" and includes "an individual who sells or offers for sale to a merchant consumer goods or consumer realty that the individual acquired primarily for personal, household, family, or agricultural purposes." The statute collectively defines "consumer credit", "consumer debts", "consumer goods", "consumer realty", and "consumer services" as "credit, debts, or obligations, goods, real property, and

§ 13-301. One such "unfair, abusive, or deceptive trade practice[]" is the "use of a contract related to a consumer transaction which contains a confessed judgment clause that waives the consumer's right to assert a legal defense to an action[.]"  CL § 13-301(12).

A confessed judgment clause is a "device designed to facilitate collection of a debt." *Goshen Run*, 467 Md. at 103 (quoting *Schlossberg v. Citizens Bank*, 341 Md. 650, 655 (1996)).  Specifically, it is a provision in a debt instrument, such as a promissory note, "by which debtors agree to the entry of a judgment against them without the benefit of a trial in the event of a default on the debt instrument."  *Id.* (internal quotation marks omitted). In *Goshen Run*, we discussed in detail some background and history of the use of confessed judgments in Maryland, including their disfavor, given their *ex parte* nature, the ease with which a judgment may be entered, and the limited defenses available to a defendant who seeks to attack the judgment after its entry.  *Id.* at 103–07.

In *Goshen Run*, we considered whether a HOA's collection of HOA assessments from a homeowner, through the use of a promissory note containing a confessed judgment clause, violated the MCPA.  We determined that it did.  *Id.* at 119.  Specifically, we considered the definitions contained in the MCPA, and held that: the homeowner fell within the definition of "consumer"; the HOA assessments fell within the broad definition of "consumer debt"; and the promissory note constituted an "extension of credit" to pay the HOA assessments.  *Id.* at 101.  We also held that the MCPA prohibits the use of all confessed judgment clauses in consumer contracts.  *Id.* at 115.

services which are primarily for personal, household, family, or agricultural purposes."  CL § 13-101(d)(1).

12

Under the facts of that case, the HOA obtained a confessed judgment based upon the confessed judgment clause in the promissory note. *Id*. at 84. Because the MCPA does not permit the use of a confessed judgment, we determined that dismissal of the confessed judgment case was required under Maryland Rule 3-611(b). *Id.* at 117. The homeowner argued that the promissory note was void in its entirety. *Id.* at 117–18. We observed that the promissory note contained a severability clause and thus we rejected the homeowner's argument. *Id.* We held that the confessed judgment clause could be severed from the remaining provisions of the promissory note "without destroying the instrument's overall validity." *Id.* at 118. We stated that the homeowner "should not obtain a windfall and escape responsibility for paying her delinquent homeowners assessments solely because the promissory note contained a confessed judgment clause." *Id.* at 118 (capitalization omitted). Accordingly, we held that the dismissal of the confessed judgment would have been without prejudice to the HOA to file a separate breach of contract action based upon the promissory note with the confessed judgment clause severed. *Id.* at 119.

To summarize, under *Goshen Run*, a HOA may not use a promissory note containing a confessed judgment clause to collect delinquent HOA assessments, because the use of a promissory note containing a confessed judgment clause violates the MCPA. *See* CL § 13-301(12). A violation of the MCPA is subject to public enforcement measures consisting of civil penalties and criminal penalties that may be imposed by the Consumer Protection Division ("Division") of the Office of Attorney General. CL §§ 13-410, 13-411.[15] In

_____

[15] In addition to the general provisions of the MCPA pertaining to public enforcement, the HOA Act and the Condominium Act specifically incorporate the public

13

addition to the public enforcement measures, a consumer who has been subjected to a prohibited practice under the MCPA has a private right of action for damages where the consumer can prove injury or loss. CL § 13-408.

In addition to the remedies afforded under the MCPA, a consumer may have a private right of action under the Maryland Consumer Debt Collection Act ("MCDCA"), CL § 14-201, *et seq.*, against any person collecting or attempting to collect an alleged debt arising out of a consumer transaction in violation of the provisions of that Act. *See Nationstar Mortgage, LLC v. Kemp*, 476 Md. 149, 161 (2021).[16] In addition to the private enforcement provisions set forth in CL § 14-203, a violation of the MCDCA also constitutes an "[u]nfair, abusive or deceptive trade practice" that violates the MCPA. CL § 13-301(14)(iii). With respect to debt collection activities by lawyers and law firms

_____

enforcement provisions under the MCPA into these statutes. *See* RP §§ 11-130(c)(1), 11B-115(c)(1). In other words, under both the Maryland HOA Act and the Maryland Condominium Act, a homeowner may seek public enforcement of his or her rights under the applicable law, through the Attorney General's Office, under the MCPA.

[16] The MCDCA prohibits eleven categories of conduct when collecting or attempting to collect a debt, including: claiming, attempting, or threatening to enforce a right with knowledge that the right does not exist. CL § 14-202(8). "To prove a claim under this provision of the MCDCA, a complainant must establish two elements: (1) the debt collector did not possess the right to collect the amount of debt sought; and (2) the debt collector attempted to collect the debt knowing that it lacked the right to do so." *Chavis v. Blibaum & Assocs., P.A.*, 476 Md. 534, 553 (2021) (cleaned up). The "with knowledge" element of this subsection of the MCDCA "require[s] proof that a debt collector claimed, attempted, or threatened to enforce the non-existent right with actual knowledge or with reckless disregard as to the falsity of the existence of the right." *Id.* at 563 (cleaned up). Under CL § 14-203, "[a] collector who violates any provision of [the MCDCA] is liable for any damages proximately caused by the violation, including damages for emotional distress or mental anguish suffered with or without accompanying physical injury."

14

specifically, in *Andrews & Lawrence Professional Services, LLC v. Mills*, 467 Md. 126 (2020), we held that not all debt collection activity undertaken by a law firm falls within the professional services exemption of the MCPA, CL § 13-104(1).[17]

Of course, we are not here to consider whether Nagle & Zaller's debt collection activities violated the state or federal consumer protection statutes. Those issues will be for the federal court to decide in connection with the other counts set forth in the Complaint that are not before us. Here, we must determine whether Nagle & Zaller's debt collection activities are subject to the MCLL.

### C. Canons of Statutory Interpretation

In considering the parties' competing interpretations of the MCLL, we apply the following principles of statutory interpretation. "The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature." *Lockshin v. Semsker*, 412 Md. 257, 274 (2010). "We begin with an examination of the text of a statute within the context of the statutory scheme to which it belongs." *Kemp*, 476 Md. at 169. "We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application." *Lockshin*, 412 Md. at

---

[17] The MCPA exempts "professional services of a . . . lawyer" from the scope of the Act. CL § 13-104(1). The MCDCA does not contain any professional services exemption for lawyers. In *Andrews & Lawrence Professional Services, LLC v. Mills*, 467 Md. 126, 156 (2020), we held that in the "debt collection context, where a lawyer or law firm engaged in debt collection activity which: (1) requires a license under the [Maryland Collection Agency Licensing Act ("MCALA")] ; or (2) which would be prohibited under the MCDCA, the professional services exception of the [M]CPA, CL § 13-104(1) does not apply to the conduct or services."

15

275 (internal quotation marks and citations omitted). Rather, we construe the statute "as a whole so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Koste v. Town of Oxford*, 431 Md. 14, 25–26 (2013) (internal quotation marks and citations omitted). We "do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Lockshin*, 412 Md. at 275. In other words, "[r]eview of the text does not merely entail putting the words under the microscope by themselves with a dictionary at hand, because words that appear clear and unambiguous when viewed in isolation may become ambiguous when read as part of a larger statutory scheme." *Kemp*, 476 Md. at 169 (internal quotation marks and citations omitted); *see also Johnson v. State*, 360 Md. 250, 265 (2000) (explaining that the Court must analyze the statute "in its entirety, rather than independently construing its sub-parts[]"). "We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Lockshin*, 412 Md. at 276. "We also review the legislative history of the statute to confirm conclusions drawn from the text or to resolve ambiguities. In addition, we examine prior case law construing the statute in question." *Kemp*, 476 Md. at 170. "Finally, we check our interpretation against the consequences of alternative readings of the text." *Bell v. Chance*, 460 Md. 28, 53 (2018). Doing so ensures that we adopt an interpretation that avoids a construction that is "illogical, unreasonable, or inconsistent with common sense." *Reier v. State Dep't of Assessments and Taxation*, 397 Md. 2, 33 (2007) (internal quotation marks and citations omitted). Indeed, "it has been

16

called a golden rule of statutory interpretation that, when one of several possible interpretations produces an unreasonable result, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result." *Id.* (internal quotation marks and citations omitted); *see also Kemp*, 476 Md. at 170 (explaining that "it is important to consider the consequences of alternative interpretations of the statute, in order to avoid constructions that are illogical or nonsensical, or that render a statute meaningless[]") (internal quotations and citations omitted).

### D. *Maryland Consumer Loan Laws—The General Statutory Framework*

The General Assembly has enacted a comprehensive statutory scheme for the regulation of consumer lending, which is set forth in Title 12 of the Commercial Law Article. Various Subtitles within Title 12 address the lending terms and conditions associated with different types of consumer loans, including the maximum interest rate, fees, and charges that lenders are permitted to charge.[18] For example, the maximum allowable interest rate that a lender may charge depends on the type of consumer loan in question.[19]

---

[18] The Subtitles contained in Title 12 of the Commercial Law Article which apply to various types of consumer loans are: Subtitle 1 (Interest and Usury); Subtitle 3 the (Maryland Consumer Loan Law — Credit Provisions); Subtitle 4 (the Maryland Secondary Mortgage Loan Law); Subtitle 5 (Retail Credit Accounts); Subtitle 6 (Retail Installment Sales); Subtitle 9 (Credit Grantor Revolving Credit Provisions); and Subtitle 10 (Credit Grantor Closed End Credit Provisions).

[19] For example, installment loans that are not secured by residential real property and are made under the Interest and Usury Subtitle generally cap interest rates at 24%, *see* CL § 12-103(c), whereas a loan that is subject to the MCLL caps interest at 33% with varying lower interest rates depending upon the amount of the original principal balance and the unpaid balance, *see* CL § 12-306.

17

In addition to the consumer credit provisions contained in Title 12 of the Commercial Law Article, the General Assembly has also enacted comprehensive licensing provisions in Title 11 of the Financial Institutions Article, which establish various types of licenses, and the terms and conditions associated with each license, depending upon the type of consumer loan being offered. Licenses are issued by the Commissioner of Financial Regulation of the Department of Labor ("Commissioner"), which has the authority to issue consumer credit licenses, investigate the qualifications of prospective licensees, issue cease and desist orders, and promulgate rules and regulations.

When considering the various requirements that are applicable to a particular consumer lending transaction—whether they pertain to the permissible terms associated with a particular type of consumer loan, the licensing requirements applicable to the lender, or the rights and remedies associated with a violation of a consumer lending law—the General Assembly has established a statutory framework whereby the provisions of Title 12 of the Commercial Law Article and Title 11 of the Financial Institutions Article must be read together. As discussed below, the Maryland Consumer Loan Law is no exception.

### E. The Maryland Consumer Loan Law ("MCLL")

The MCLL is located in two separate Articles of the Maryland Code: (1) the Maryland Consumer Loan Law – Credit Provisions, set forth at CL § 12-301, *et seq.* ("Credit Provisions"); and (2) the Maryland Consumer Loan Law – Licensing Provisions, set forth in the Financial Institutions Article ("FI") § 11-201, *et seq.* ("Licensing Provisions"). Both the Credit Provisions and the Licensing Provisions, together, form the "Maryland Consumer Loan Law." *See* FI § 11-201(f) (stating that the "'Maryland

18

Consumer Loan' law means this subtitle and Title 12, Subtitle 3 of the Commercial Law Article[]"); CL § 12-317(b) and FI § 11-223 (each stating that the Credit Provisions and the Licensing Provisions "may be jointly cited as the Maryland Consumer Loan Law[]").

### 1. The MCLL Credit Provisions

Under the Credit Provisions of the MCLL, a person is prohibited from "engag[ing] in the business of making loans . . . unless the person is licensed or is exempt from the licensing requirements of" the Licensing Provisions. CL § 12-302. The MCLL defines "lender" as a "licensee or a person who makes a loan subject to this subtitle." CL § 12-301(c). A "licensee" is a "person who is required to be licensed under the [Licensing Provisions], regardless of whether the person is actually licensed." CL § 12-301(d). And a "loan" is "any loan or advance of money or credit subject to this subtitle, regardless of whether the loan or advance of money or credit is or purports to be made under this subtitle." CL § 12-301(e)(1).

The Credit Provisions "appl[y] to a loan of $25,000 or less made for personal, family or household purposes." CL § 12-303(a)(1).[20] Among other things, the Credit

---

[20] The Credit Provisions contain some exclusions. Specifically, CL § 12-303(a)(3) states that the Credit Provisions "do[] not apply to:

    (i)    A plan or loan for which a written election has been made under Subtitle 1 [Interest and Usury], Subtitle 4 [Maryland Secondary Mortgage Loan Law], Subtitle 9 [Credit Grantor Revolving Credit Provisions], or Subtitle 10 [Credit Grantor Closed End Credit Provisions] of this title;

    (ii)    A loan made by an individual provided the individual:

        1.    Does not make more than three loans in a calendar year; and

19

Provisions regulate lender advertising, CL § 12-304; prohibit discrimination against loan applicants, CL § 12-305; limit the maximum rate of interest permitted to be charged, CL § 12-306; define the fees a lender may collect, CL §§ 12-307, 12-307.1; outline the duties of lenders, CL § 12-308; and prohibit a lender from taking a confessed judgment as security for a loan, CL § 12-311(b)(1). "A loan made in the amount of $25,000 or less, regardless of whether the loan is or purports to be made under this subtitle, is void and unenforceable if . . . [a] person who is not licensed under or exempt from the licensing requirements under [the Licensing Provisions] made the loan." CL § 12-314(b)(1)(i)(3).[21] If a loan is unenforceable under the MCLL, "[a] person may not receive or retain *any* principal,

_____

> 2.   Does not engage in the business of making loans; or

> (iii)   A loan between an employer and an employee."

[21] Curiously, although the MCLL refers to persons who are "exempt from licensing," neither the Credit Provisions (CL § 12-301, *et seq.*) nor the Licensing Provisions (FI § 11-201, *et seq.*) contain any exemptions from the licensure requirements. In other words, under the plain language of the statute, any "person who makes a loan" under the Credit Provisions is required to be licensed. *See* FI §§ 11-201(e); 11-203.1. Although the MCLL does not contain any license exemptions, FI § 11-202 states as follows:

> (a) The Maryland Consumer Loan Law does not change any powers conferred by law on any person who is not required or permitted to be licensed under this subtitle.

> (b) The Commissioner may not license any bank, trust company, savings bank, credit union, or savings and loan association.

By way of contrast, the licensing provisions that apply to the Interest and Usury Subtitle contain licensing exemptions. Specifically, under CL § 12-103(c)(4), a lender who makes a loan under subsection (c) "is subject to the licensing provisions of Title 11, Subtitle 3 of the Financial Institutions Article." When one peruses the provisions set forth in that particular licensing subtitle, they will find that it contains various exemptions. *See* FI § 11-302.

interest, fees, or other compensation" in connection with the loan.  CL § 12-314(b)(2) (emphasis added); *see also* CL § 12-314(d)(1) (stating that with respect to a loan that is void and unenforceable under this section, a person may not "collect, directly or indirectly, any amount from the borrower[]").

### 2. *The MCLL Licensing Provisions*

The definitions contained in the Licensing Provisions include a definition of "loan" that mirrors the definition of "loan" contained in the Credit Provisions.  FI § 11-201(e).[22] The MCLL defines "license" as a "license issued in any form by the Commissioner under this subtitle to make loans under the Maryland Consumer Loan Law[.]" FI § 11-201(d). "Licensee" is defined as "a person licensed under this subtitle to make loans under the Maryland Consumer Loan Law." FI § 11-201(d-1).  Under the Licensing Provisions:

Unless a person[23] is licensed by the Commissioner, the person may not:

(1) Make a loan; or

(2) In any way use any advantage provided by the Maryland Consumer Loan Law.

FI § 11-203.1(a).

---

[22] FI § 11-201(e) specifies that:

"Loan" means any loan or advance of money or credit subject to Title 12, Subtitle 3 of the Commercial Law Article, the Maryland Consumer Loan Law — Credit Provisions, regardless of whether the loan or advance of money or credit is or purports to be made under Title 12, Subtitle 3 of the Commercial Law Article.

[23] A "person" is defined under the MCLL as "an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal commercial entity."  CL § 12-301(f); FI § 11-201(g).

21

The Licensing Provisions require that a person obtain a license through the Nationwide Multistate Licensing System & Registry to "[m]ake a loan." FI § 11-203.1. The Licensing Provisions contain, in part, the qualifications of an applicant for a license, FI § 11-205; requirements for applying for a license, paying fees, and filing a surety bond, FI § 11-206; and various powers of the Commissioner of Financial Regulation (the "Commissioner"), including: the authority to investigate applicants for licensure, FI § 11-207; the power to grant or deny license applications, *id.*; the right to issue a cease and desist order for a violation of the MCLL or any rule or regulation, FI § 11-215; the power to suspend and revoke licenses, FI § 11-216;[24] and the power to adopt rules and regulations to carry out the provisions of the subtitle, FI § 11-203.

FI § 11-205 sets forth the following:

To qualify for a license, an applicant shall satisfy the Commissioner that:

 (1) The applicant has at least $20,000 in liquid assets available to be used in the business to be covered by the license;

 (2) The business will promote the convenience and advantage of the community in which the place of business will be located; and

 (3) The applicant or, if the applicant is not an individual, the owners, officers, directors, or members have sufficient experience, character, financial responsibility, and general fitness to:

---

[24] Before the Commissioner enters a cease and desist order or suspends a license, the applicant has a hearing before the Commissioner, which shall be held in accordance with the Administrative Procedures Act. FI § 11-217. Additionally, any applicant for a license or licensee who is aggrieved by a decision of the Commissioner may appeal to the circuit court, in the jurisdiction in which the aggrieved person resides or does business, with a right to appeal the circuit court's decision to the Court of Special Appeals. FI § 11-218.

(i)      Command the confidence of the public; and

(ii)     Warrant the belief that the business will be operated lawfully, honestly, fairly, and efficiently.

The initial license issued by the Commissioner is valid for one-year and may be renewed thereafter for additional one-year terms, upon the filing of an application for renewal, paying the renewal fee of $850, and satisfying the requirements for renewal. FI § 11-209.

Any person who violates the Licensing Provisions by making a loan without a license "is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $5,000 or imprisonment not exceeding 3 years or both." FI § 11-222. "The Commissioner shall report to the appropriate State's Attorney any alleged criminal violation of the Maryland Consumer Loan Law." FI § 11-220.

To summarize, under the MCLL, a "person may not engage in the business of making loans" under the Credit Provisions "unless the person is licensed or exempt from the licensing requirements" under the Licensing Provisions. CL § 12-302. Under the Licensing Provisions, "loan" is broadly defined to include any loan made under the Credit Provisions. FI § 11-201(e). And the Licensing Provisions explicitly state that a person may not "make a loan" under the MCLL unless licensed by the Commissioner. FI § 11-203.1. If a person makes a loan under the MCLL without a license, the loan is void and unenforceable. CL § 12-314(b)(1)(i)(3).

23

### F. The Parties' Competing Interpretations

Turning to the plain language of the statute, Delegall directs our analysis to the very broad definition of "loan" set forth in CL § 12-301(e)(1). Delegall points out that in *Goshen Run*, 467 Md. at 87, within the context of a claim arising under the MCPA, we held that a promissory note containing a confessed judgment clause for the repayment of delinquent HOA fees constituted an extension of "consumer credit," which falls within the purview of the MCPA. Delegall argues that Nagle & Zaller "made" the loans because they drafted the notes, computed the amounts due, collected the amounts due, filed confessed judgment actions to collect on the notes, and engaged in garnishment activities. Delegall contends that Nagle & Zaller fall within the broad definition of "person" under the Credit Provisions, CL § 12-301(f). In addition, Delegall argues that Nagle & Zaller serviced the notes as the HOA's agent and is also liable under an agency theory. Delegall also argues that under the Credit Provisions, the MCLL broadly applies to any "person" who makes *any* "loan" for $25,000 or less—regardless of whether the person is required to be licensed.

Nagle & Zaller admits that it engages in debt collection activities that fall within other consumer protection statutes. Specifically, Nagle & Zaller does not dispute that the firm undertakes collection activities on behalf of its clients, including drafting promissory notes, collecting clients' debts, and charging the delinquent homeowners the attorneys' fees incurred in enforcing the notes. Nagle & Zaller also acknowledges that, in *Goshen Run*, we held that the MCPA prohibits the use of confessed judgment clauses and confessed judgment actions "in this exact type of transaction." Nagle & Zaller points out that the MCLL is *not* the MCPA—it is a different statute that applies to different circumstances.

24

Nagle & Zaller asserts that one must read the plain language of the Credit Provisions within the entire context of the MCLL, including the Licensing Provisions, as well as the purpose of the statute. Nagle & Zaller argues that the MCLL is intended to regulate the consumer lending industry and only applies to persons "in the business of making loans." Nagle & Zaller contends that neither the law firm nor the HOA are in the "business of making loans," and to hold otherwise would lead to an illogical result. Specifically, Nagle & Zaller argues that such a broad interpretation would require any law firm that drafts loan documents, or a structured settlement in the amount of $25,000 or less with payments over time, to obtain a consumer loan license.

### G. The MCLL Is Intended to Regulate the Consumer Lending Industry – Persons "In the Business of Making Loans"

#### 1. The Plain Language

The MCLL clearly envisions that only persons who are licensed by the Commission may engage in the business of consumer lending: "A person may not *engage in the business of making loans* under this subtitle unless the person is licensed or exempt from the [Licensing Provisions]." CL § 12-302 (emphasis added). The MCLL does not define what it means to be "in the business of making loans." Nor does it define what it means to "make a loan."

The Court of Special Appeals has observed that "[t]here is a dearth of authority in Maryland addressing the meaning of the phrase 'in the busines of.'" *Old Republic Ins. Co. v. Gordon,* 228 Md. App. 1, 17 (2016). In *Gordon*, the court pointed out that the New Hampshire Supreme Court has opined "that 'in the business of' has two ordinary meanings:

25

(1) any regular activity that occupies one's time and attention, with or without direct profit motive; or (2) an activity with a direct profit objective." 228 Md. App. at 17 (quoting *American Legion Post # 49 v. Jefferson Ins. Co.*, 485 A.2d. 293, 294 (N.H. 1984)) (some internal quotations omitted). Black's Law Dictionary defines "business" as "a commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain." (11th ed. 2019).

A law firm and the lawyers it employs are certainly in the business of providing legal services to clients, which may include drafting loan documents; drafting settlement agreements that include structured payments; and engaging in debt collection activity. The question here is whether the Legislature considers a lawyer or law firm who engages in such conduct as being a person who "makes a loan" or who is "in the business of making loans" and, consequently, subject to the requirements of the MCLL. Given the broad, general definitions set forth within the statute, we determine that the statutory language is ambiguous and, therefore, we shall look to the legislative history.

### 2. *The Legislative History of the MCLL*

Maryland's licensing requirements for lenders of loans dates to a 1912 Act, which, among other things, required licensing of "petty loan brokers," capped certain fees depending on the amount borrowed, and mandated disclosure of the loan's terms to the borrower. *Price v. Murdy*, 462 Md. 145 (2018) (citing Ch. 836, 1912 Md. Laws 1621, 1621–24). The Act required "[a]ny person, firm, corporation, or association" to "obtain a license for *carrying on the business* of petty loan broker." Ch. 836, 1912 Md. Laws at 1622 (emphasis added). Like the current MCLL, any violation of the 1912 Act rendered every loan in connection with the

26

violation null and void, which allowed the borrower to recover "any and all sums paid or returned on account of or in connection with such loan." *Id.* at 1624.

In 1918, the General Assembly replaced the 1912 Act with the Uniform Small Loan Law. Ch. 88, 1918 Md. Laws 197. The law capped the interest rate for loans under $300 made by unlicensed lenders. *Id.* at 198. The Act's preamble identified the Legislature's goals of "prohibiting false or misleading statements" regarding these loans, setting maximum interest rates and charges, and regulating wage garnishments. *Id.* at 197–98. The preamble to that law declared that:

> The conduct of [the business of making small loans] has long been the cause of general complaint, and of much hardship and injustice to borrowers, and there is no regulation or provisions of law which has proved effective for the protection of such borrowers and for the punishment of usurious money lenders . . . and there is a real need for the enactment of a law that will enable [the] continuance [of small loan lending] under proper supervision[.]

*Id.* at 198. In describing the 1918 Act, this Court noted that "[c]ountless instances illustrate the oppression and injustice wrought upon small needy borrowers by the callous and cruel greed so often found in the class engaged in the business of lending money in small amounts to those who have little to offer as security[.]" *Liberty Fin. Co., Inc. v. Catterton*, 161 Md. 650, 654 (1932).

In 1945, the General Assembly created the Maryland Industrial Finance Law, Ch. 932, 1945 Md. Laws 1438, 1453, to cover small loans. Md. Code, Art. 11, §§ 165, 203 (1957, 1968 Repl. Vol.). Its purpose was to provide "further remedial legislation regulating the lending of sums of money not presently regulated by existing laws." *Id.* § 163. The law required licensure or exemption from licensure for lenders of up to $1,500. *Id.* § 165.

27

It also, among other things, governed the uniformity of monthly installment amounts, fee collection, payment, and any consequent refunding of interest. *Id.* § 196. The law did not repeal or otherwise affect the 1918 law's regulation of loans and lenders of under $300, which itself had been codified at Article 58A. *Id.* § 166. Article 58A provided parallel regulation until it was repealed in 1977.[25]

---

[25] Prior to its recodification into the Commercial Law Article, former Maryland Industrial Finance Law, Article 11, § 166 (1976 Repl. Vol.) excluded certain businesses from its application:

> This subtitle shall not apply to any person, copartnership, trust, or corporation doing business under and as permitted by any law of this State or of the United States relating to banks, savings banks, trusts companies, building and loan associations, credit unions, or cooperative banks for personal credits, nor to any attorney engaged in the practice of law, nor to any bona fide pawnbroking business, licensed under the laws of Maryland, nor to any person, firm or corporation extending credit in connection with the sale of their own merchandise, nor to any person, copartnership, trust, or corporation licensed and doing business under any Maryland lending provisions in any other article of the Code, and nothing in this article shall act as a bar to prevent any of the aforesaid persons, copartnerships, trusts, or corporations from qualifying for and receiving a license and operating hereunder.

When Article 11 was repealed as part of the recodification of the consumer credit laws into the newly created Commercial Law Article, the business exemption formerly set forth in Article 11, § 166 was repealed as part of the overall repeal of that Article. *See* Ch. 33, 1980 Md. Laws 136. Delegall argues that the elimination of the former business exemption, which included lawyers, evidences the General Assembly's intention to include lawyers within the purview of the MCLL. We do not read such an intention into the elimination of the exemption. *First*, as noted above, the elimination was part of a wholesale repeal of a former statute with no discussion or legislative history to indicate the reason for the repeal of a particular section. *Second*, the fact that the General Assembly eliminated a categorical exclusion for attorneys does not mean that the Legislature intended that the MCLL licensing provisions would affirmatively apply to all attorneys who drafted promissory notes or loan documents within the lending ceiling established by the MCLL. Perhaps the General Assembly concluded that the exclusion was unnecessary because attorneys engaged in the practice of law are not "in the business of making loans." *Third*,

28

In 1975, the General Assembly added the "Commercial Loan Article" to the Maryland Annotated Code and renamed the Maryland Industrial Financial Law the Maryland Consumer Loan Law ("MCLL"). *See* Ch. 49, 1975 Md. Laws 81, 397–435; *see also* Md. Code, CL § 12-301, *et seq.* (1975).[26] The licensing requirement at issue here appeared in the 1975 Act and was codified at CL § 12-302. The Revisor's Note for the licensing requirement makes clear that its obligation already existed:

> This subsection is new language derived without substantive changes from Art. 11, § 165. It is repeated here to note the general requirement of licensure for making of loans under this subtitle. The specific licensing provisions are retained in the cited Maryland Consumer Loan Law – Licensing Provisions, Art. 11, §§ 163 et seq[.]

CL § 12-302. The language of the licensing requirement contained in CL § 12-302 has remained unchanged since its enactment in 1975, save for substituting "person" for "he" in 1980. Ch. 33, 1980 Md. Laws 136, 727. The licensing requirement contained in the Credit Provisions now reads: "A person may not engage in the business of making loans under this subtitle unless the person is licensed under or is exempt from the licensing requirements of Title 11, Subtitle 2 of the Financial Institution Article, The Maryland Consumer Loan Law – Licensing Provisions." CL § 12-302.

---

since the exemption was repealed over four decades ago, experience has shown that attorneys who draft loan documents for clients or settlement agreements with payment terms, or engage in debt collection activities have not, in fact, sought licenses under the MCLL or been subject to enforcement proceedings by the Commissioner.

[26] The 1975 Code revisions were part of Maryland's Code revision process, which began in 1970 as a long-term project to create a modern comprehensive code. *See In Re S.K.*, 466 Md. 31 n.21 (2019). The Code revision process was not completed until 2016. *Id.* The legislative changes that are described herein beginning with the 1975 Act were part of the code-recodification process.

The 1975 Act also repealed and reenacted with amendments the 1918 Act and renamed that subtitle "Small Loans – Licensing Provisions."  Ch. 49, 1975 Md. Laws 81, 86–87.  The Revisor's Note in the session law points out that FI § 11-203.1 of the Small Loans – Licensing Provisions subtitle, which corresponded to the 1918 Act, states that a person "may not make a loan," while its counterpart in CL § 12-302, states that a person "may not engage in the business of making loans."  *Id.* at 399–400; *see also id.* at 419–420 (pointing out the same difference again); *id.* at 435 ("The Commission notes that there are several differences between the present provisions of Art. 58A and Art. 11 for which the Commission is unaware of the reason in policy or practice; however, to avoid any inadvertent substantive change, the Commission has not attempted to conform these provisions.").

In 1977, the General Assembly repealed the 1918 Uniform Small Loan Law, which had been codified in Article 58A, "[for] the purpose of consolidating the laws of [Maryland] relating to small loans and consumer loans into a unified Maryland Consumer Loan Law."  Ch. 693, 1977 Md. Laws 2818, 2818.  By the conclusion of the code recodification process, the credit provisions, which originated in Article 11 (the Industrial Finance Law), became (with some revisions) the surviving MCLL-Credit Provisions; and the licensing provisions that originated in Article 58A (the Small Loan Law) became (with some revisions) the surviving MCLL-Licensing Provisions.

In the 2018 Legislative Session, the General Assembly made some revisions to certain sections of the Credit Provisions.  Ch. 790, 2018 Md. Laws 4064.  The revisions included, among other things, revising the definitions set forth in CL § 12-301, clarifying

30

the applicability of the Credit Provisions, CL § 12-303, and increasing the threshold for a loan subject to the MCLL from $6,000 to $25,000. *Id.* at 4064–65; *see also* CL §§ 12-311, 12-314. The Fiscal and Policy Note for House Bill 1297, the bill which initiated the passage of Chapter 790 of the 2018 Maryland Laws, reflected that the Bill implemented several recommendations made in a report of the Maryland Financial Consumer Protection Commission ("MFCPC") that relate to consumer lending. Specifically, it explained that:

> [T]he bill establishes new requirements within the interest and usury sections of the Commercial Law Article for a "covered loan" that prohibit an unlicensed person from making such a loan. In addition, the bill increases from $6,000 to $25,000 the threshold below which a loan is subject to small lending requirements within the [MCLL] and prohibits a person from lending $25,000 or less if the person is not licensed under (or exempt from) the requirements under MCLL. The bill also establishes that specified violations result in a loan becoming *void* as well as unenforceable.

H.B. 1297, 2018 Leg., Reg. Sess. (Md. 2018), Fiscal and Policy Note. The comments from the Office of the Attorney General Consumer Protection Division contained in the Legislative Bill file for House Bill 1297 stated that:

> The current version of HB 1297 was the result of a collaborative effort between the Consumer Protection Division, the Office of the Commissioner of Financial Regulation, and counsel for the Maryland bankers. The bill provides important protections for consumers while simultaneously clarifying and updating Maryland's lending laws, most of which have been in place since the 1970's or earlier. More specifically, the bill clarifies the relationships between different subtitles within Title 12 of the Commercial Law Article;[27] it modernizes the amounts covered by the [MCLL] and the

---

[27] One of the changes effectuated by the enactment of House Bill 1297 during the 2018 Legislative Session is that "[o]n or after January 1, 2019, a lender may, at the lender's option, elect to make a loan" under the Interest and Usury Subtitle or the Credit Provisions of the MCLL. CL § 12-101.1(a). The lender may make this written election by specifying in the loan agreement, note or other evidence of the loan that the Interest and Usury Subtitle will govern the loan. CL § 12-101.1(b).

Retail Installment Sales Act; it provides increased relief for consumers under both the MCLL and the Interest and Usury Law as a result of predatory lending; and it codifies the long-standing principle that it is necessary to look behind the form [of] a transaction to its substance when determining whether a particular transaction constitutions a loan, and if so, whether it is usurious.

Notably, although House Bill 1297 made changes to the maximum lending amount under the MCLL and provided some updated definitions, it did not make any changes to CL § 12-302, which describes the licensing requirements for persons "engaged in the business of making loans" under the MCLL, nor did it alter the licensing requirements set forth in Title 11, Subtitle 2 of the Financial Institutions Article, which apply to *all* persons who "make a loan" under the MCLL.  FI §§ 11-201(e), 11-203.1.

### 3.  *The Purpose of the Statute – Regulation of Small Consumer Lenders*

The legislative history makes clear that, from the inception of these laws, the General Assembly intended them to regulate petty loan brokers and persons traditionally engaged in the business of consumer lending.  The General Assembly enacted the first iteration of the statute—the Uniform Loan Law—to curb abuses in the consumer lending industry and to remedy the evils associated with loan sharks.  *Price*, 462 Md. at 148–49. In the preambles to the 1918 Act and the 1945 Act, the General Assembly explained its intent to regulate the business of money lending in an effort to remedy abuses in that industry.  Ch. 88, 1918 Md. Laws 197, 198; Ch. 932, 1945 Md. Laws 1438, 1438–39.  In

---

The statute further provides that *even where* the lender fails to make the written election described above, the Usury and Interest Subtitle applies to a loan where the loan is "[f]or an amount of $25,000 or less; and [n]ot subject to [the Credit Provisions of the MCLL]."  CL § 12-101.1(c).  In other words, the Legislature recognizes that there are certain small loans in an amount of $25,000 or less that do *not* fall within the MCLL, which would be subject to the provisions of the Interest and Usury Subtitle, CL § 12-101, *et seq.*

other words, they were intended to apply to traditional loans or extensions of credit made by lenders who are in the business of making consumer loans.

Our review of the legislative history, including the 2018 amendments to the Credit Provisions, Ch. 790, 2018 Md. Laws 4064, does not reflect an intent by the Legislature to expand the reach of the MCLL beyond traditional consumer lenders who are "in the business of making loans." Although the Legislature increased the monetary amount that is subject to the MCLL to $25,000, there is nothing to indicate that it intended to expand the licensing requirements of the MCLL to businesses that are not otherwise engaged in traditional consumer lending practices.

Reading the plain language of the statute—which regulates persons "in the business of making loans"—in the context of the legislative history and the purpose of the statute, leads us to the clear conclusion that the General Assembly intended the MCLL to regulate businesses engaged in consumer lending, and did not intend for it to apply to all lawyers or law firms that draft loan documents or engage in collection activity on behalf of clients. Nor is there any evidence that the Legislature intended to require that HOAs or condominium regimes be licensed in order to exercise their statutory right to collect delinquent assessments or charges, including entering into payment plans for the repayment of past-due assessments. When one considers the licensing requirements for loans made under the MCLL, they do not contemplate the licensing of law firms or HOAs under the Licensing Provisions. For example, to qualify for a license, the applicant must demonstrate, among other things, that its "business will promote the convenience and advantage of the community in which the place of business will be located[]". FI § 11-

33

205. These types of licensing criteria do not lend themselves to an application to a HOA or a law firm.

To hold that the General Assembly intended to regulate conduct, *i.e.*, the act of making *any* loan in an amount of $25,000 or less, instead of regulating persons engaged in the consumer lending industry, would ignore the plain language of the statute, which requires that the person be "in the business" of making loans. We will not interpret a statute in a manner that ignores the plain language or renders it surplusage. *See Koste*, 431 Md. at 25–26.

We determine that the MCLL is an industry-regulating statute that is intended to require entities or individuals "in the business of" consumer lending to obtain a license from the State before engaging in that activity. CL § 12-302. It applies to a more limited class of consumer transactions than the MCPA—which covers a broad range of conduct that may be considered unfair or deceptive. In other words, the applicability of the MCLL depends on whether the person lending money is in the industry of consumer lending that the General Assembly intends to regulate.[28]

---

[28] The website for the Office of the Commissioner of Financial Regulation supports our determination that the MCLL is an industry-specific statute. It states: "The Office of the Commissioner of Financial Regulation ("Office") is the state agency responsible for regulating the financial services industry in Maryland." https://www.dllr.state.md.us/finance/industry/frregulatedind.shtml, available at https://perma.cc/S2K9-W3DA. "Consumer Loan Lending" is included among the list of industries and activities that the Office regulates. *Id.*

### 4. *The Alternative Reading – An Illogical Result*

Finally, we observe that Delegall's broad interpretation would lead to illogical and unreasonable results that are inconsistent with common sense. To hold that the MCLL covers all transactions involving any small loan or extension of credit—without regard to whether the lender is "in the business of making loans"—would cast a broad net over businesses that are not currently licensed under the MCLL. For example, under Delegall's interpretation of the MCLL, *any* business or organization that offers a payment plan for the repayment of a debt in an amount of $25,000 or less—such as a HOA, physician's office, hospital, or law firm—would need to be licensed under Subtitle 2 of Title 11 of the Financial Institutions Article. Clearly, the statute does not apply to businesses where the primary business purpose is something *other* than making consumer loans in an amount of $25,000 or less. Such an interpretation would not only render the "in the business" language of the statute nugatory but would create a result that is not based upon logic or the current licensing practices enforced by the Office of Commissioner of Financial Regulation.

As the Maryland State Bar Association points out in its *Amicus Curiae* brief, under Delegall's interpretation, every Maryland lawyer who represents a creditor-client that agrees to settle a claim for $25,000 or less through settlement payments made over time, and drafts a settlement agreement that memorializes such terms, would be required to be licensed under the MCLL. Under such an interpretation, where a law firm drafts such a document without a consumer loan license issued by the Commissioner, the consequence

35

would be that the underlying indebtedness would be void and unenforceable. Surely, the General Assembly did not intend for the MCLL to be applied to these types of transactions.

In conclusion, we hold that a law firm that prepares promissory notes or undertakes debt collection activity on behalf of a HOA client is not subject to the MCLL because it is not a "lender" that is "engaged in the business of making loans" under the provisions of the MCLL. Rather, a law firm is in the business of providing legal or debt collection services to its clients. Although a law firm's conduct is subject to regulations under the Fair Debt Collection Act and similar statutes, when the law firm engages in debt collection activities,[29] such activities are not synonymous with consumer lending activities that require a license under the MCLL. We similarly conclude that a HOA that extends a payment plan for the repayment of delinquent HOA assessments is not "in the business of making loans" and, therefore, not subject to the MCLL. Any extension of credit by a HOA under these circumstances is an ancillary function of the HOA's operations associated with the protection and maintenance of common areas and community-related infrastructure. Offering a payment plan to a homeowner for the payment of delinquent HOA fees does not transform the HOA into a consumer lender that must be licensed under the MCLL.

---

[29] *See*, *e.g.*, *Heintz v. Jenkins*, 514 U.S. 291, 294 (1995) (holding that the Fair Debt Collection Practices Act applies to attorneys that "regularly 'attempt' to 'collect'" consumer debt through litigation because they are "debt collectors" under the statute); *Andrews & Lawrence Pro. Servs., LLC v. Mills*, 467 Md. 126, 145 (2020) (determining that a lawyer's conduct may be a violation of the MCDCA if the "lawyer's services could be provided by any licensed debt collection agency without regard to whether the agency is affiliated with a lawyer or a law firm" or if "the collection activities in question do not fall within the lawyers' 'professional services' exemption of the [MCPA]").

Finally, we reject Delegall's argument that by holding that the MCLL does not apply to these transactions it will create a void whereby these types of transactions are unregulated. As *Goshen Run* demonstrates, the MCPA prohibits any unfair or deceptive trade practices, in connection with repayment plans for delinquent debts, including a prohibition on the use of confessed judgment notes. Attorneys are also subject to the requirements of the federal and state debt collection statutes when they undertake debt collection activities and are not otherwise exempt from the statutes. As far as HOA or condominium fees specifically, as discussed above, the fees and assessments are subject to the statutory requirements of the HOA Act and the Condominium Act. Moreover, other credit statutes may apply to loans in an amount of $25,000 or less in certain lending transactions where the MCLL has no application. *See, e.g.*, FI § 12-101.1(c)(2).

Our holding that the MCLL does not apply to a law firm engaged in debt collection activity on behalf of its client simply recognizes that the MCLL, by its plain language, applies to persons "in the business" of making consumer loans, and is intended to regulate the consumer lending industry, not law firms engaged in debt collection activity.

**CERTIFIED QUESTION OF LAW ANSWERED AS SET FORTH ABOVE. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**

37

United States District Court
for the District of Maryland
Case No. 8:20-cv-00626-PWG
Argued: December 6, 2021

IN THE COURT OF APPEALS

OF MARYLAND

Misc. No. 6

September Term, 2021

_____

NAGLE & ZALLER, P.C., ET AL.

v.

JAHMAL E. DELEGALL, ET AL.

_____

*Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Gould,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: August 11, 2022

*Getty, C.J., and McDonald, J., now Senior
Judges, participated in the hearing and
conference of this case while active members of
this Court. After being recalled pursuant to Md.
Const., Art. IV, § 3A, they also participated in
the decision and adoption of this opinion.

Respectfully, I dissent. I would answer the certified question of law "yes" and hold that, based on the facts set forth in the operative complaint, which was incorporated into the federal court's certification order, Nagle & Zaller, P.C. ("Nagle & Zaller"), a law firm, is subject to the provisions of the Maryland Consumer Loan Law, Md. Code Ann., Comm. Law (1975, 2013 Repl. Vol.) ("CL") §§ 12-301 to 12-317 (Credit Provisions), and Md. Code Ann., Fin. Inst. (1980, 2011 Repl. Vol.) ("FI") §§ 11-201 to 11-223 (Licensing Provisions).

Treating as true the well-pled factual allegations in the operative complaint (the third amended complaint) and construing the Credit Provisions to effectuate their general remedial purpose, I would conclude that the Maryland Consumer Loan Law applies in this case. In the certification order, the United States District Court for the District of Maryland incorporated the operative complaint by reference into its summary of the background and attached the complaint as an exhibit to the certification order. A brief summary of some of the facts from the operative complaint is as follows. Nagle & Zaller provides legal services and debt collection services for homeowner associations and other creditors. Nagle & Zaller required debtors to enter into promissory notes with confessed judgment clauses. The promissory notes typically were not for more than $25,000, and the homes at issue were used for personal, household, family, or agricultural purposes.

According to the complaint, the protocol that Nagle & Zaller typically employed when using promissory notes with confessed judgment clauses was as follows. First, an employee of Nagle & Zaller, usually a clerk or paralegal, contacted a consumer who allegedly owed a debt to a creditor that had hired Nagle & Zaller to collect the debt on its

behalf. An agent or employee of Nagle & Zaller—a clerk, paralegal, or attorney—would tell the consumer that the only way that the consumer could avoid further legal action as to the debt would be to sign an agreement. A promissory note with a confessed judgment clause would be sent to the consumer. When the consumer asked questions about the promissory note, the employee of Nagle & Zaller would represent, either expressly or impliedly, that the terms of the promissory note were legal, binding, and enforceable. After the consumer signed the promissory note, Nagle & Zaller collected payments from the consumer. In many instances, even when the consumer made all of the required payments, an employee of Nagle & Zaller would nonetheless initiate a confessed judgment action against the consumer. The confessed judgment promissory notes, by their nature, not only forced consumers to waive all of their rights to defend against the entry of judgment, but Nagle & Zaller also added costs, pre-assessed interest and other charges, and according to the complaint, assessed unreasonable attorney's fees that drove up the alleged principal amount owed.

In this case, the conclusion that Nagle & Zaller was engaged in the business of making loans is warranted by the plain language of the Maryland Consumer Loan Law. The Maryland Consumer Loan Law applies to "lenders," which are entities that make loans subject to the Credit Provisions. See CL § 12-301(c). CL § 12-302 sets forth a licensing requirement, stating that "[a] person may not engage in the business of making loans under this subtitle unless the person is licensed under or is exempt from the licensing requirements of Title 11, Subtitle 2 of the Financial Institutions Article, the Maryland Consumer Loan Law -- Licensing Provisions." And, CL § 12-311(b)(1) provides that a

lender may not take a confession of judgment as security for a loan.

As used in the Maryland Consumer Loan Law, the word "'[l]oan' means any loan or advance of money or credit subject to" the Credit Provisions, "regardless of whether the loan or advance of money or credit is or purports to be made under" the Credit Provisions. CL § 12-301(e)(1); FI § 11-201(e). A loan is subject to the Credit Provisions if it is $25,000 or less and "made for personal, family, or household purposes." CL § 12-303(a)(1).

Based on the facts alleged in the operative complaint, Nagle & Zaller was engaged in the business of making loans subject to the Credit Provisions. According to the complaint, in hundreds, if not thousands, of instances, while representing homeowner associations, Nagle & Zaller drafted promissory notes with confessed judgment clauses to be signed by people who typically owed up to $25,000 in allegedly delinquent homeowner association assessments. The amounts owed under the promissory notes were higher than the alleged principal amounts owed. Nagle & Zaller contacted people, convinced them to sign the promissory notes, sent them the promissory notes, received the signed copies, collected payments, kept at least a portion of the payments for itself as attorney's fees, and sued the people based on confessed judgment clauses in the promissory notes.

Under the circumstances described in the complaint, which we accept as true, Nagle & Zaller used the promissory notes it drafted to create new advances of credit—*i.e.*, loans—with new terms of repayment and new consequences of nonpayment, namely confessed judgments. In other words, Nagle & Zaller did not simply attempt to collect, or arrange for the deferment of, existing debts owed to homeowner associations. As such, Nagle & Zaller did not merely act as an attorney or an agent of the homeowner associations.

Rather, Nagle & Zaller created new loan obligations with new terms, including a provision for confessed judgments, and obtained attorney's fees for itself by operation of the confessed judgment clauses.

The conclusion that Nagle & Zaller acted as a lender is warranted not only by the plain language of the Maryland Consumer Loan Law, but also by our case law. In Goshen Run Homeowners Ass'n, Inc. v. Cisneros, 467 Md. 74, 119, 223 A.3d 917, 943 (2020), a case with circumstances similar to this one, we held that a promissory note with a confessed judgment clause was subject to the Maryland Consumer Protection Act because it was an extension of credit to pay delinquent homeowner association assessments.[1] We explained that the promissory note was an extension of credit because, on its face, the promissory note was comprised of the homeowner's acknowledgement of, and agreement to repay, the delinquent homeowner association assessments under specified terms. See id. at 100, 223 A.3d at 932. We determined that "[t]he language in the Promissory Note clearly reflect[ed] that it consist[ed] of an extension of credit for the payment of [homeowner association] assessments—a debt incurred by [the individual] for personal, household and family purposes[.]" Id. at 100, 223 A.3d at 932.

The same is true of the promissory notes with confessed judgment clauses in this case. The instant promissory notes are subject to the Maryland Consumer Loan Law as

---

[1]In Goshen Run, 467 Md. at 83, 223 A.3d at 922, the law firm that represented the homeowner association was not a party to the case before us, which arose out of a confessed judgment action that the homeowner association initiated against a homeowner. The homeowner sued the law firm in a circuit court, but the case was removed to federal court. See id. at 84 n.3, 223 A.3d at 923 n.3. Accordingly, in Goshen Run, we did not address whether the law firm was subject to the Maryland Consumer Protection Act.

advances of credit to pay delinquent homeowner association assessments; and under the circumstances of this case, Nagle & Zaller, a law firm, is engaged in the business of making loans. I agree that the General Assembly did not intend the Maryland Consumer Loan Law to apply to any and all law firms that may draft loan documents or engage in collection activities for clients, but under the facts alleged in the instant complaint, Nagle & Zaller was plainly engaged in the business of making loans.

Law firms are not categorically exempt from statutes governing consumer protection or advances or extensions of credit, as demonstrated by two opinions that we issued within the past several years. In Andrews & Lawrence Pro. Servs., LLC v. Mills, 467 Md. 126, 156, 223 A.3d 947, 964 (2020)—a case in which the petitioner was the law firm that represented the homeowner association in Goshen Run, 467 Md. at 82, 223 A.3d at 921—we held that the exemption of "professional services" from the Maryland Consumer Protection Act does not apply to a lawyer or law firm that engages in debt collection activity for which a license is required under the statute or that is prohibited under the Maryland Consumer Debt Collection Act. We explained that our conclusion was consistent with the Maryland Collection Agency and Licensing Act, to which a lawyer or law firm is subject where it engages in the same actions as a collection agency through non-attorney employees, and the Maryland Consumer Debt Collection Act, which has no exemption for professional services by attorneys. See Andrews & Lawrence, 467 Md. at 154, 223 A.3d at 963. In Comm'r of Fin. Regulation v. Brown, Brown, & Brown, P.C., 449 Md. 345, 348-50, 144 A.3d 666, 669 (2016), we held that there was substantial evidence to support an administrative law judge's determination that a law firm was subject

to the Maryland Credit Services Businesses Act. We were unpersuaded by the law firm's contention that the categories "law firm" and "credit services business" were mutually exclusive, such that an entity primarily engaged in the practice of law could not be engaged in credit services on a regular and continuing basis, as required for the statute to apply. See id. at 367, 144 A.3d at 679-80. So, that Nagle & Zaller is a law firm engaged in the practice of law does not preclude it from being subject to the Maryland Consumer Loan Law.

Given the circumstances alleged in the complaint, under the Maryland Consumer Loan Law, Nagle & Zaller was a lender that was engaged in the business of making loans, as the promissory notes with confessed judgment clauses constituted loans. The plain language of CL § 12-301(e)(1) states that the word "'[l]oan' means any loan or advance of money or credit subject to this subtitle, regardless of whether the loan or advance of money or credit is or purports to be made under this subtitle."

The instant promissory notes were loans under CL § 12-301(e)(1) because they were advances of credit in the amount of $25,000 or less made for personal, family, or household purposes—specifically, for satisfying debts that homeowners owed to homeowner associations. If true, the factual allegations in the complaint establish that it was Nagle & Zaller, not the homeowner associations, that acted as the lender in connection with the promissory notes. Indeed, without the promissory notes created by Nagle & Zaller, the confessed judgment clauses were not part of the original homeowner association agreements. Under these circumstances, Nagle & Zaller was plainly not acting solely as an agent of the homeowner association and attempting to collect an existing debt owed to the homeowner association, but instead used the promissory notes to create entirely new

debts. In fact, the complaint indicates that the homeowner association's role with regard to the promissory notes was entirely passive and limited to receiving a portion of the payments that Nagle & Zaller collected pursuant to the promissory notes.

To conclude that the Maryland Consumer Loan Law does not apply in this case is to essentially create a loophole allowing law firms, like Nagle & Zaller, to engage in the business of making loans, *i.e.*, creating new extensions of credit with confessed judgment clauses. It is clear that the General Assembly expressly intended to prohibit confessed judgment clauses in contracts for loans subject to the Credit Provisions. See CL § 12-311(b)(1). From my perspective, this prohibition cannot and should not be circumvented by permitting the outsourcing of responsibility for collecting a debt to a law firm that would, as Nagle & Zaller does, engage in the business of making loans. Such a practice would create a gap in the Maryland Consumer Loan Law that the General Assembly did not intend.

For the above reasons, respectfully, I dissent.